Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
nediha@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| M. S., L. S., and C.J. S.,<br><br>       Plaintiffs,<br><br>vs.<br><br>PREMERA BLUE CROSS, MICROSOFT CORPORATION, and the MICROSOFT CORPORATION WELFARE PLAN,<br><br>       Defendants. | COMPLAINT<br><br>Case Number 2:19-cv-00199-RJS |

Plaintiffs M. S. ("M."), L. S. ("L."), and C.J. S. ("CJ"), through their undersigned counsel, complain and allege against Defendants Premera Blue Cross ("Premera"), Microsoft Corporation ("Microsoft"), and the Microsoft Corporation Welfare Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. M. and L. are natural persons residing in King County, Washington. M. and L. are CJ's parents.

1

2. Premera is an independent licensee of the nationwide Blue Cross and Blue Shield Association and was the third-party claims administrator for the Plan during the treatment at issue in this case.

3. At all relevant times Premera acted as agent for Microsoft and the Plan.

4. Microsoft was the designated administrator for the Plan.

5. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). M. was a participant in the Plan and CJ was a beneficiary of the Plan at all relevant times.

6. CJ received medical care and treatment at Daniels Academy ("D.A.") from August 31, 2017, through December 22, 2018. D.A. is a licensed residential treatment facility located in Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. D.A. specializes in treating individuals on the autism spectrum.

7. Premera denied claims for payment of CJ's medical expenses in connection with his treatment at D.A. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse M. and L. for the medical expenses they have incurred and paid for CJ's treatment.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Premera does business in Utah, either in its own capacity or through its network of Blue Cross affiliates, and the treatment at issue took place in Utah. Finally, in light of the sensitive

nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages pursuant to 29 U.S.C. §1132(c) based on the failure of the agents of Microsoft as Plan administrator, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### CJ's Developmental History and Medical Background

11. CJ started displaying unusual behavior as early as the age of three. He was subsequently evaluated by clinical psychologist Dr. Julie Osterling and was diagnosed with a pervasive developmental disorder not otherwise specified and with anxiety. CJ also started meeting with psychiatrist and neurologist Dr. Stephen Glass when he was five years old who confirmed these diagnoses and began prescribing CJ medications.

12. CJ exhibited aggressive and violent behaviors in kindergarten and was placed in an Individualized Education Program, Although CJ received additional support from the program it was mostly ineffective, his violent outbursts often required classroom evacuations or isolating him from the other students. CJ received ongoing behavioral, social, occupational, and language therapies.

13. CJ was moved to a therapeutic classroom setting with additional staffing and support, including a part time social worker and a padded closet to contain children during violent or aggressive episodes. While CJ's behavior did improve, he was unable to function independently, and this continued throughout middle school. CJ was given a neuropsychological exam by Dr. Guy Oram PhD., who recommended that CJ be placed in a therapeutic boarding school.

14. As a teenager, CJ increasingly isolated himself and developed an addiction to electronics. When M. and L. attempted to regulate his screen time, he would lash out violently to the point that M. and L. had to call the police for assistance. CJ's therapist Erin C. Milhem, PsyD., implemented a Safety Intervention Plan.

15. In 2016, CJ started meeting with a new therapy team, but continued to make little progress. M. and L. met with an educational consultant and CJ was again evaluated by Dr. Stephen Glass, both of whom, along with CJ's therapist Dr. Erin Milhem, recommended that CJ attend an outdoor behavioral health program in Hawaii called Pacific Quest.

16. CJ was admitted to Pacific Quest on June 15, 2017, however he was asked to leave the program after only five weeks of treatment due to a pattern of aggression, defiance, and hostile incidents. One of CJ's therapists at Pacific Quest, Dr. Todd Corelli PhD., confirmed CJ's diagnoses of autism and anxiety, and also diagnosed him with Oppositional Defiant Disorder.

17. After CJ's treatment failure at Pacific Quest, he was briefly enrolled at ViewPoint Center in Utah to stabilize his behavior. After six weeks of treatment and short-term stabilization at ViewPoint Center, CJ was transferred to D.A.

## D.A.

18. CJ was admitted to D.A. on August 31, 2017.

19. In an unsigned letter dated September 8, 2017, Premera denied payment for CJ's

    treatment at D.A. The reviewer gave the following justification for the denial:

    …To make this decision, we reviewed your contract, the medical policy McKesson InterQual Criteria, BH: Child and Adolescent Psychiatry Interqual 2017, and the medical records your provider, Daniels Academy sent to us. We have determined this service is considered not medically necessary. As a result, we will not cover this service. Please contact your provider to discuss your treatment recommendations and care.

    The treatment guidelines we use state that residential treatment for a mental health condition is medically necessary when, because of a serious emotional disturbance, all of these situations are present:
    - You are so functionally impaired that you can't follow instructions or ask for help to get your needs met, or you can't control your behavior for more than 48 hours.
    - You cannot be managed safely in the community because, for the last 6 months or longer, you have been repeatedly hurting yourself, hurting others, damaging property, getting arrested, running away to dangerous situations, or having other serious psychiatric symptoms.
    - Your support system is not available, unsafe, not able to manage your difficulties or keep you safe, or it was not helping your treatment in a lower level of care.

    Residential treatment for a mental health condition is denied as not medically necessary. Information from your provider does not show that you are currently so functionally impaired that you can't follow instructions or ask for help to get your needs met, or you can't control your behavior for more than 48 hours, and you cannot be managed safely in the community because, for the last 6 months or longer, you have been repeatedly hurting yourself, hurting others, damaging property, getting arrested, running away to dangerous situations, or having other psychiatric symptoms. The information also does not show that your support system is not available, unsafe, not able to manage your difficulties or keep you safe, or was not helping your treatment in a lower level of care. The information that your provider sent about your problems are from before your previous residential treatment stay in a different residential treatment facility, not from the present time.

    The treatment guidelines we use also state that, in addition to other requirements, residential treatment for a mental health condition is medically necessary only when:

- A psychiatric evaluation is done within one business day of admission, and then (add when necessary: by a psychiatrist) [sic] at least one time per week.
- A psychosocial evaluation is done within 48 hours of admission.
- A substance use evaluation is done within 48 hours of admission.
- Clinical assessment by a licensed provider is done at least one time per day.
- You receive individual or group or family therapy at least three times per week.

The information from your provider shows one individual therapy session on 9/5/17, but otherwise does not show any of the evaluations or therapy services listed above. The information does include a treatment plan, but a treatment plan does not show that evaluations or therapy services have actually been done. …

20. On February 27, 2018, M. and L. submitted a level one appeal of the denial of CJ's treatment at D.A. They argued that Premera had not complied with its obligations under ERISA. They wrote that ERISA "provisions are intended to protect consumers and ensure that plans are fairly administered." They asked Premera to give them a full, fair, and thorough review, and to evaluate their appeal in accordance with ERISA regulations.

21. They wrote that the McKesson InterQual Criteria utilized by Premera incorrectly conflated acute and subacute levels of care. They argued that acute treatment was necessary for an individual at "[i]mminent risk of serious harm to self or others." They wrote that residential treatment however, was designed for individuals who needed a subacute level of care and was not appropriate for individuals experiencing acute symptomology.

22. They contended that Premera's acute inpatient criteria and its subacute residential treatment criteria were "strikingly similar," even though these criteria are not interchangeable with each other nor are the subacute level services offered at a residential treatment equivalent to the services provided in an acute facility. They wrote that

6

requiring acute symptomology to receive subacute care was not in accordance with generally accepted standards of medical practice.

23. They quoted a January 2018 letter from board certified child and adolescent psychiatrist Dr. Michael Connolly who wrote in part:

> Residential treatment always involves subacute inpatient treatment on a 24-hour/7 day a week basis. If a patient is acute life threatening [sic] or threat to themselves or others, or if they are psychotic, they cannot be cared for in a residential treatment setting without violating well recognized standards for proper care of substance use disorders and mental health issues. Treatment in an acute inpatient setting is the proper level of care for these patients until they are no longer a threat to themselves or others.

24. They argued that the guidelines utilized by Premera were arbitrary and were not consistent with the Plan's definition of medical necessity. They asserted that CJ qualified for residential treatment according to the terms of the Plan, and while Premera had denied his treatment due to the guidelines it used, Premera should have relied on the terms of the Plan to evaluate CJ's treatment as the Plan documents took precedence over any guidelines Premera elected to use.

25. They wrote that Premera was in violation of MHPAEA when it denied CJ's treatment. They contended that MHPAEA requires insurance companies to offer mental health coverage "at parity" with comparable medical and surgical services. They noted that Premera did not impose requirements such as acute symptomology on analogous intermediate levels of care such as skilled nursing facilities and argued that such treatment limitations were in violation of MHPAEA.

26. M. and L. included several letters of medical necessity with the appeal. In CJ's discharge summary from Pacific Quest, his therapist Brian Konik PhD., wrote in part:

> The following are my further recommendations for [CJ]'s future success.

7

- Residential placement outside of the home to better enable [CJ]'s healthy individuation and identity development. This is also necessary for emotional awareness and regulation.

In a Psychological Assessment Report dated July 21, 2017, Todd Corelli PhD., wrote in part:

> In summary, CJ struggles with several significant issues. These include poor coping skills, emotional immaturity, anger outburst, oppositional and defiant behaviors, anxiety, and social difficulties that are consistent with Autism Spectrum Disorder. Given the seriousness of these test findings, it is recommended that following his stay at Pacific Quest, CJ go onto a longer term residential program that can continue addressing each of these issues in depth.

In an undated letter, one of CJ's therapists at ViewPoint, Chad Stark LCMHC, MA, wrote in part:

> CJ was admitted to ViewPoint Center on 7/21/2017 after receiving services from Pacific Quest (PQ) Wilderness. He was discharged from PQ for aggression and violence toward staff and students when he became emotionally dysregulated. His behaviors at PQ led to a therapeutic hold, and his resistance to the hold led to the injury of a staff member. The initial plan to transition him to Daniels Academy was unsuccessful. He became upset, would not stay, started to walk away from campus, and was making threats that he was going to kill himself. Daniels staff advised that he come to ViewPoint for stabilization.
>
> While at ViewPoint CJ focused on managing his behaviors when emotionally dysregulated, accepting boundaries, and finding alternative ways to express distress other than threats of suicide. Three therapeutic holds were necessary while he was at ViewPoint. His dad [M.] brought him to ViewPoint Center initially and when [M.] began to leave CJ became upset and aggressive. A hold was required to avoid violence. Shortly after that hold was terminated CJ swung at a staff member when he was asked to hand over an electronic device that was not allowed. This aggression required another hold. Nine days later CJ was being disrespectful and disruptive… As he was being escorted out of the community he became violent and a hold was initiated.
>
> By the end of August CJ had not progressed to a level to be successful at home but was able to increase his ability to manage this tendency toward violence to a level that Daniels Academy could accept responsibility to help him be safe in their community.

CJ's longtime therapist Erin Milhem PsyD, wrote in part in a letter dated February 1, 2018,

> Because of his level of dysregulation, the [S.] family, his doctors, and myself felt that it would not be safe for CJ to return home. It was agreed upon, that in order to keep CJ and others safe, he needed placement in a residential program.
>
> Because of CJ's complex behavioral and educational needs, as well as the addiction behaviors around electronics, his placement needed a specific focus on skills related to autism spectrum disorders… Upon review and consultation it was decided that Daniel's Academy met this criteria, and was a place where CJ can be kept safe, as well as learn skills that are essential for independent living in the future, both things that are not doable in the home at this time. Currently, CJ's behaviors are not safe for a family environment, and they pose a threat to both himself and others. Other residential placements do not have the level of expertise around autism spectrum disorders that CJ requires. It is my professional opinion that Daniel's Academy is medically necessary for CJ, and is a place where he can receive the specialized interventions needed for continued growth, development, recovery, and safety.

27. M. and L. argued that it was clear from the opinions of the medical professionals who had treated CJ in person, as well as from his medical records (which were included with the appeal) that CJ's residential treatment was medically necessary. They wrote that CJ continued to struggle with aggressive behaviors, poor emotional regulation, learned helplessness, and non-compliance with treatment.

28. They asked that in the event Premera upheld the denial that it provide them with a copy of all documents under which the Plan was operated including: all governing plan documents, the summary plan description, any insurance policies in place for the benefits they were seeking, any administrative services agreements that existed, any mental health and substance use disorder criteria, including the Plan's skilled nursing and rehabilitation facility criteria, and any reports from any physician or other professional regarding their

claim. (collectively the "Plan Documents") They argued that they were entitled to these documents as they were part of the documents under which the Plan was operated.

29. Premera sent the Plaintiffs a letter dated March 20, 2018, stating that it planned to deny care, but if the Plaintiffs provided additional documentation, Premera would be willing to consider it. The letter claimed that "In your appeal, you referenced MHPAEA. Premera is compliant with MHPAEA regulations." The letter then contained a paragraph in strikethrough text which gave a definition of MHPAEA and parity requirements.

30. On March 26, 2018, Premera sent the Plaintiffs a corrected letter, which was largely the same as the March 20, 2018, letter except it omitted the strikethrough text and contained the opinion of an external reviewer from the Medical Review Institute of America who opined that CJ's treatment was not medically necessary.

31. The reviewer contended that according to the terms of the Plan and the McKesson Interqual criteria CJ did not qualify for residential treatment and that residential treatment was not the lowest level of care at which CJ could have been safely and effectively treated. The reviewer argued that CJ could have been treated in the partial hospitalization level of care, and that "for the period of time in question, the patient's presentation was such that the plan language definition of medically necessary treatment was not met."

32. The reviewer wrote in part:

> By 8/31/17, the patient's clinical presentation had significantly stabilized without any episodes of aggression, threats to self or others, or other severely inappropriate behavior, [sic] compared to his presentation at the time of admission. The patient continued to present with episodes of rigidity of thinking and occasional defiance of treatment expectations. These episodes were consistent with the patient's chronic symptoms related to autism spectrum disorder and will require ongoing treatment, but did not require treatment in a setting with 24 hour a day observation and monitoring.

33. The reviewer failed to elaborate on how they had determined that by August 31, 2017, CJ's behavior had "significantly stabilized" compared to the time of his admission, given that CJ was also admitted to D.A. on August 31, 2017.

34. On March 28, 2018, Premera received a letter from M. and L. containing the opinion of CJ's longtime neurologist Dr. Glass, stating that CJ's treatment was medically necessary. On March 29, 2018, Premera sent the Plaintiffs a letter stating that it had reviewed the letter from Dr. Glass, but was upholding its decision to deny payment.

35. On July 10, 2018, M. and L. requested that the denial of CJ's treatment be evaluated by an external review agency. They reiterated their concern that Premera had relied on Interqual clinical guidelines to help inform its decision to deny care when these guidelines were deficient, made no distinction between acute and subacute levels of care, and were not in accordance with generally accepted standards of medical practice.

36. They argued that CJ's treatment was and continued to remain medically necessary. They noted that he suffered from a variety of mental health and behavioral problems and that his functional impairments were manifest across multiple settings. They wrote that CJ was being treated at the lowest level of care at which he could be safely and effectively treated and that outpatient levels of care, including partial hospitalization programs, were determined by CJ's treating professionals to be inadequate for his needs given the severity of his symptoms.

37. They argued that CJ struggled with his behavior even within the confines of a residential treatment center and argued that a less stringent program such as partial hospitalization would not have been safe or effective, if they could even convince CJ to go in the first place.

38. They included a copy of the March 28, 2019, letter from Dr. Stephen Glass which stated in part:

    > To date, no single or combined approach has afforded adequate control of very challenging behaviors. Extensive counseling, social skills support and school programs have failed to afford adequate support to meet C.J.'s needs. As a result, the family and I have spoken at length about alternate placement options including the potential benefit of residential therapeutic programs including summer, residential wilderness programs. C.J. has taken advantage of these, though still, similar challenges continue with anxiety, reactivity, inattention and distractibility, problems in impulse control and finally, concerns about developing depression.
    >
    > With this in mind, it has been my recommendation, with the family's concurrence, that C.J. enter a residential therapeutic program at Daniels Academy where he has now resided and attended since last December. …
    >
    > [A] diligent attempt was made to provide C.J. the best possible support available within his current geography in Washington State, and it was only after exhausting these resources and still seeing critical symptomology that a choice for residential care was undertaken. At this point, I believe such a decision is timely, medically necessary and most fortunately, providing notable gains thus far.

39. M. and L. argued that CJ was finally beginning to show progress in his treatment and that moving him down to a lower level of care before he was ready would lead to a relapse to his old symptoms and behaviors. They included an updated copy of CJ's medical records with the appeal. These records showed that CJ continued to struggle with "learned helplessness" and other negative behaviors. He was asked to leave a group due to problematic behavior, threatened suicide to get his way, became violent on a camping trip resulting in the police being called, was aggressive and defiant with staff, peers, and his parents, and threatened to stab himself in the eye.

40. M. and L. again requested that in the event that Premera upheld the denial that it provide them with a copy of the Plan Documents.

12

41. In a letter dated July 27, 2018, external review agency Medical Consultants Network upheld the denial. The reviewer answered the question of whether they considered CJ's treatment to be medically necessary by writing:

> No. This request is not considered to be medically necessary as medical necessity means healthcare services provided for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, mental illness, substance use disorder, condition, disease or its symptoms, that are all of the following: in accordance with generally accepted standards of medical practice, and, clinically appropriate, in terms of type, frequency, extent, sight and duration, and considered effective for the patient's illness, injury, mental illness, substance use disorder, disease or its symptoms, and, not mainly for the patient's convenience or that of the patient's doctor or other healthcare provider, and, not more costly than an alternative drug, service, or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's illness, injury, disease or symptoms.

42. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

43. The denial of benefits for CJ's treatment was a breach of contract and caused M. and L. to incur medical expenses that should have been paid by the Plan in an amount totaling over $179,000.

44. Premera failed to provide the Plaintiffs with a copy of the Plan Documents, including the medical necessity criteria for skilled nursing or rehabilitation facilities in spite of M. and L.'s requests.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

45. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Premera, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29

U.S.C. §1104(a)(1).

46. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

47. Premera and the Plan breached their fiduciary duties to CJ when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in CJ's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of CJ's claims.

48. The actions of Premera and the Plan in failing to provide coverage for CJ's medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

49. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

50. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

51. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical

benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

52. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

53. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for CJ's treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Premera exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner Premera excluded coverage of treatment for CJ at D.A.

54. The actions of Premera and the Plan requiring that CJ satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

55. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Premera, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and

more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

56. The violations of MHPAEA by Premera and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and Premera insured plans as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

## THIRD CAUSE OF ACTION

### (Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c))

57. Premera, acting as agent for Microsoft who was the administrator of the Plan, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including the medical necessity criteria for skilled nursing and rehabilitation facilities.

58. Premera repeatedly failed to produce to the Plaintiffs the documents under which the Plan was operated, including the medical necessity criteria for mental health, skilled nursing and rehabilitation facility treatment, within 30 days after they had been requested.

59. The failure of Microsoft and its agent Premera, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of M. and L.'s February 27, 2018, and July 10, 2018, letters provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (C) for this count to improper statutory penalties up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

60. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

   WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for CJ's medically necessary treatment at D.A. under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.      For an award of statutory penalties against Microsoft of up to $110 a day after the first 30 days for each instance of Premera's failure or refusal to fulfill its duties, as agent of Microsoft, to provide the Plaintiffs with the Plan Documents they had requested.

4.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.      For such further relief as the Court deems just and proper.

DATED this 20th day of March 2019.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs


County of Plaintiffs' Residence:
King County, Washington.