IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| M. S., L. S., and C.J.S.,<br><br>        Plaintiffs,<br><br>v.<br><br>PREMERA BLUE CROSS, MICROSOFT CORPORATION, and the MICROSOFT CORPORATION WELFARE PLAN,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.: 2:19-cv-00199-RJS-CMR<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

This case arises under the Employee Retirement Income Security Act of 1974 (ERISA). Plaintiffs M.S., L.S., and C.J.S. filed this lawsuit against Defendants Premera Blue Cross (Premera), Microsoft Corporation (Microsoft), and Microsoft Corporation Welfare Plan (the Plan) after the Plan's claim administrator denied the S. Family's claim for residential treatment benefits rendered to their minor son, C.S., for oppositional defiant disorder, autism spectrum disorder, pervasive developmental disorder, and anxiety.  The S. Family and Defendants cross-move for summary judgment on the S. Family's three claims: (1) denial of benefits, (2) violations of the Parity Act, and (3) statutory penalties under ERISA.  For the reasons stated below, both motions are GRANTED in part and DENIED in part.

# BACKGROUND[1]

The S. Family lives in King County, Washington.  Microsoft employed M.S. and provided the Family with group health coverage through a self-funded benefit plan.  C.S. was a beneficiary of the Plan.  Before addressing the legal issues presented, the court first discusses the relevant Plan language, C.S.'s medical treatment, and the procedural history of the case.

## I.        The Plan

The Plan designates Microsoft as the Named Fiduciary and Plan Administrator.[2] Pursuant to the Plan documents, Microsoft delegated its claim procedure duties to the claim administrator, Premera.[3]

The Plan requires mental health treatment to be "medically necessary" for coverage.[4] The Plan defines "medically necessary" as covered services meeting certain criteria, including:

> (1) It is essential to the diagnosis or treatment of an illness, accidental injury, or condition that is harmful or threatening to the enrollee's life or health, . . . .
> (2) It is appropriate for the medical condition as specified in accordance with authoritative medical or scientific literature and generally accepted standards of medical practice.
> (3) It is a medically effective treatment of the diagnosis as demonstrated by the following criteria:
> > (a) There is sufficient evidence to draw conclusions about the positive effect of the health intervention on health outcome.
> > (b) The evidence demonstrates that the health intervention can be expected to produce its intended effects on health outcomes.
> > (c) The expected beneficial effects of the health intervention on health outcomes outweigh the expected harmful effects of the health intervention.
> (4) It is cost-effective, as determined by being the least expensive of the alternative supplies or levels of service that are medically effective and that can be safely provided

---

[1] Because the parties filed cross-motions for summary judgment, the court will "provide[] a neutral summary of the facts, . . . 'in the light most favorable to the nonmoving party' and 'draw reasonable inferences therefrom' while evaluating the motions in turn." *Stella v. Davis Cty.*, Case No. 1:18-cv-002, 2019 WL 4601611, at *1 n.1 (D. Utah Sept. 23, 2019) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012)).  Except where otherwise noted, the facts that follow are not disputed.

[2] Dkt. 58 (Defendants' Motion for Summary Judgment) at 17.

[3] *Id.* at 18.

[4] Dkt. 82 (Family's Motion for Summary Judgment and Opposition to Defendants' Motion) ¶ 4.

to the enrollee.  A health intervention is cost-effective if no other available health intervention offers a clinically appropriate benefit at a lower cost.
(5) It is not primarily for research or data accumulation.
(6) It is not primarily for the comfort or convenience of the enrollee, the enrollee's family, the enrollee's physician or another provider.
(7) It is not recreational, life-enhancing, relaxation or palliative therapy, except for treatment of terminal conditions.[5]

As used in this definition, "generally accepted standards of medical practice," means "standards that are based on credible scientific evidence published in peer reviewed medical literature that is generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of physicians practicing in relevant clinical areas, and any other relevant factors."[6]

Premera uses the McKesson InterQual Criteria as a factor to determine whether residential treatment care is appropriate for a mental health condition.[7]  These criteria require all the following for extended stays (sixteen days or more) at a residential treatment center due to serious emotional disturbance:

- At least one of the following factors related to functioning present within the last week:
  o School refusal or daily resistance to school attendance,
  o An interpersonal conflict, defined as any of the following:
    ▪ hostile or intimidating in most interactions,
    ▪ persistently argumentative when given direction,
    ▪ poor or intrusive boundaries causing anger in others and requiring frequent staff intervention,
    ▪ threatening, or
    ▪ unable to establish positive peer or adult relationships.
  o Improved independent functioning, requiring both
    ▪ Discharge planned within the next week, and
    ▪ Therapeutic passes planned to transition to alternate level of care.
  o Repeated privilege restriction or loss of privileges,
  o Unable or unwilling to follow instructions or negotiate needs, or
  o Unresponsive to staff direction or limits.
- All of the following interventions within the last week:

---

[5] Dkt. 82 ¶ 4; Dkt. 58 at 8.

[6] Dkt. 58 at 8.

[7] Dkt. 82 ¶ 5; Dkt. 58 at 9.

- o   Behavioral contract or symptom management plan,
- o   Clinical assessment at least one (1) time per day,
- o   Individual or group or family therapy at least three (3) times per week,
- o   Individual or family psychoeducation,
- o   Psychiatric evaluation at least one (1) time per week, and
- o   School or vocational program.
- •   At least one of the following symptoms present within the last week:
  - o   Aggressive or assaultive behavior,
  - o   Angry outbursts,
  - o   Depersonalization or derealization,
  - o   Destruction of property,
  - o   Easily frustrated and poor impulse control,
  - o   Homicidal ideation without intent,
  - o   Hypervigilance or paranoia,
  - o   Nonsucidial self-injury,
  - o   Persistent rule violations, or
  - o   Psychiatric medication refractory or resistant and symptoms increasing or persisting.[8]

Premera also uses separately formulated InterQual Criteria to determine whether services rendered at skilled nursing facilities and inpatient rehabilitation facilities are medically necessary.[9]  Premera does not use any separately formulated criteria beyond the language of the Plan to determine whether inpatient hospice services are medically necessary.[10]

In the event a claim for benefits is denied "in whole or in part," the Plan provides that Premera will send the claimant a written notice including: (1) the specific reason or reasons for denial; and (2) reference to the specific Plan provisions on which the denial is based.[11]  The Plan also provides for this written notice to be provided by Premera when a claimant appeals the

---

[8] Dkt. 82 ¶ 6.  As the Family notes, Defendants cite the version of the InterQual criteria at R. 1548 for a continued stay in a residential treatment center.  Dkt. 82 at ¶ 6 n.6.  However, the language does not correlate with the language in the record at that citation.  *See* Dkt. 58 at 9–10.  The criteria listed above reflects the InterQual Criteria from the record and the Family's statement of undisputed facts.

[9] Dkt. 82 ¶ 7.  The Family challenges Defendants' reliance on the InterQual Criteria for inpatient rehabilitation facilities because of Defendants' misrepresentations to the court that these criteria do not exist.  Dkt. 85 (Family's Reply) at 14.

[10] Dkt. 82 ¶ 8.

[11] *Id.* ¶ 9.

4

denial.[12]  The Plan states Premera will send the claimant notice of "the specific reason or reasons for denial" if it denies the claimant's appeal.[13]

## II.    C.S.'s Medical History and Treatment

When C.S. began attending kindergarten, he started exhibiting violent and aggressive behavior.[14]  At age five, C.S. began receiving ongoing behavioral, social, occupational, and language therapies.[15]  After several evaluations, C.S. was diagnosed with anxiety, emotional issues, and Pervasive Developmental Disorder—Not Otherwise Specified.[16]

Throughout his teenage years, C.S. became increasingly socially isolated and addicted to electronics, the internet, and technology.[17]  C.S. also displayed aggressive and violent behavior centered on parental boundaries on his technology use.[18]  C.S.'s violent behavior was severe enough that it sometimes required local police assistance and for C.S.'s therapist, Dr. Erin Milhelm, to implement a "Safety Intervention Plan" to help keep C.S.'s family safe during his episodes.[19]  C.S. would also sometimes threaten self-harm or suicide during his outbursts and would become aggressive with family members beyond his parents.[20]  Because of C.S.'s episodic violence and aggression, his parents found it "extremely difficult" to enforce boundaries and rules.[21]

---

[12] *Id.* ¶ 10.

[13] *Id.*

[14] *Id.* ¶ 11.

[15] *Id.* ¶ 14.

[16] Dkt. 82 ¶ 15; Dkt. 58 at 3.

[17] Dkt. 82 ¶ 19; Dkt. 58 at 3.

[18] *Id.*

[19] Dkt. 82 ¶ 20.

[20] *Id.* ¶ 25.

[21] *Id.* ¶ 26.

In late 2016, C.S.'s parents met with an educational consultant to guide them in their selection of therapeutic programs for him.[22] They eventually decided to send C.S. to "Pacific Quest," an outdoor behavioral health program in Hawaii.[23] The Family enrolled C.S. at Pacific Quest on June 15, 2017.[24] On July 17, 2017, C.S. left the program.[25] A therapist at Pacific Quest explained C.S. left "due to escalations both verbal and physical[] with staff."[26]

While at Pacific Quest, C.S. received a psychological assessment by Todd Corelli, PhD.[27] Dr. Corelli concluded his evaluation noting,

> In summary, [C.S.] struggles with several significant issues. These include poor coping skills, emotional immaturity, anger outburst[s], oppositional and defiant behaviors, anxiety, and social difficulties that are consistent with Autism Spectrum Disorder. Given the seriousness of these test findings, it is recommended that following his stay at Pacific Quest, [C.S.] go onto a longer term residential program that can continue addressing each of these issues in depth. [C.S.] requires placement in a structured, therapeutic, residential school outside of the home where he understands expectations and is given direct in vivo feedback when he gets overwhelmed. He will need a variety of therapeutic interventions, including individual, group, and family therapy. . . . Such a program will also need to provide [C.S.] with an academic environment that includes small class sizes with individualized attention and instruction.[28]

After C.S.'s discharge from Pacific Quest, his parents enrolled C.S. in Daniels Academy for mental health residential treatment.[29] Although C.S. was initially unable to transfer directly

---

[22] Dkt. 82 ¶ 28; Dkt. 58 at 4.

[23] Dkt. 82 ¶ 29; Dkt. 58 at 4.

[24] Dkt. 58 at 4.

[25] *Id.*

[26] Dkt. 82 ¶ 30; Dkt. 58 at 4.

[27] Dkt. 82 ¶ 33. Defendants dispute that C.S. received a psychological assessment while at Pacific Quest. *See* Dkt. 58 at 4. Defendants rely on the Family's Complaint which erroneously dates the assessment as occurring on July 21, 2017. Dkt. 58 at 4–5. As cited by both parties, the Assessment Report indicates the assessment occurred on July 7, 2017 while C.S. was attending Pacific Quest and was merely reported on July 18, 2017. *See* Dkt. 82 ¶ 33 (citing Rec. 0226); Dkt. 58 at 4–5 (citing Rec. 225)).

[28] Dkt. 82 ¶ 34; Dkt. 58 at 5.

[29] Dkt. 82 ¶ 35; Dkt. 58 at 5.

to Daniels Academy from Pacific Quest due to his "poor emotional regulation," he later

transferred to Daniels Academy after receiving six weeks of short-term residential mental health

treatment at a facility called ViewPoint Center (ViewPoint).[30]  At ViewPoint, C.S. received

greater stabilization and assessment but did not receive an evaluation of the medical necessity for

an extended stay at a residential treatment center.[31]

     C.S. was discharged from ViewPoint on August 31, 2017, and his parents enrolled him at

Daniels Academy the same day.[32]  C.S.'s Master Treatment Plan for treatment at Daniels

Academy was created on October 2, 2017.[33]  As the reason for referral or presenting problem,

the Master Treatment Plan indicates,

> Parents report [C.S.] was diagnosed with PDD-NOS and is extremely rigid in his
> thinking and behavior at home.  Over time he has become addicted to computer
> devices and has difficulty transitioning on and off, which can lead to rude and
> sometimes aggressive behavior.  He dislikes homework and doing chores as they
> divert time away from his electronic devices.  He is very close-minded to try new
> things.  He struggled in school with attention deficit problems, would get
> overwhelmed easily and have difficulty working in groups.[34]

The Master Problem List includes both Autism Spectrum Disorder and unspecified anxiety

disorder.[35]  C.S.'s anticipated discharge date was listed as Spring 2019 with obstacles to

discharge including that C.S. "[s]eeks to be rescued, feels hopeless, helpless, [l]ack of social

support, poor interpersonal skills, [and] executive functioning deficits."[36]

---

[30] Dkt. 82 ¶ 36; Dkt. 58 at 5.

[31] Dkt. 58 at 5.

[32] Dkt. 82 ¶ 37; Dkt. 58 at. 5–6.

[33] Dkt.58 at 6.

[34] *Id.*

[35] *Id.*

[36] *Id.*

While at Daniels Academy, C.S.'s mental health problems manifested on at least the

following dates:

- September 13, 2017–observed to be "non-compliant and walking away out of staff's sight and supervision," "upset" with staff, "struggling significantly[,]" and "[e]motionally fragile."
- September 14, 2017–became rigid and verbally aggressive during family therapy, becoming "very upset[,]" telling his mother to "fuck off," and refusing to participate in further therapy.
- September 24, 2017–needed to be restrained after attempting to stab staff members with a pencil, attempting to "lock himself in [a] bathroom," placed on safety restrictions.
- October 10, 2017–noted to let "emotions build up over [a] day" and then became "aggressive towards others as a release."
- October 17, 2017–observed to be sad and "[a]nxious" during therapy, expressed that he felt "as if he does not have the ability to do what is required of him."
- October 26, 2017–struggled with "learned helplessness" and difficulty asserting himself.
- October 31, 2017, to November 2, 2017–became aggressive with a peer, had a physical altercation with that peer, then subsequently "minimized his role in the interaction" during therapy.
- January 9, 2018–struggled with sadness and "helplessness distortion."
- January 13, 2018–refused to participate in a group exercise, "did not listen to staff[,]" and "walked away from staff several times."
- January 22, 2018–refused to participate in a group exercise after trying for five minutes and becoming frustrated, obstinate, and then leaving the activity.
- February 15, 2018–observed to be struggling with "helplessness" and "cognitive distortions."
- Approximately March 6, 2018–threatened self-harm and became aggressive and verbally abusive during family therapy.
- Immediately preceding March 25, 2018–threatened suicide during a home visit.
- Shortly prior to April 22, 2018–became violent on a camping trip, forcing staff to call police after several attempts to calm him down failed.
- May 1, 2018–observed to be struggling with "victim stance and self-pity" regarding his aggression.
- May 10, 2018–threatened self-harm (stabbing himself in the eye) during a therapy session, blocked the door, and did not allow his therapist to leave until the therapist was eventually successful in calming him down.[37]

---

[37] Dkt. 82 ¶ 38 (a)–(p).  Defendants dispute that C.S. was "involved in any altercation[] and did not threaten suicide" while enrolled at Daniels Academy.  Dkt. 58 at 7.  However, to support this fact, Defendants cite to portions of the record specifically reflecting incidents where C.S. threatened suicide while enrolled at Daniels Academy.  Dkt. 58 at 7 (citing R. 21 (noting when C.S. was on a home visit "[h]e admitted 'going to crises' by threatening suicide 'if they send me back.'"  Also reporting on a different day, "once mom was called, CJ engaged her in discharge talk and then when he did not get her to commit to a time line, he threatened to hurt himself.")).

C.S. received his first, and only, psychiatric evaluation at Daniels Academy on October 2, 2017.[38]  In it, Dr. Poonam Som indicated the "Chief Complaint," as reported by C.S.'s parents, was C.S.'s "addict[ion] to gaming."[39]  Dr. Som also described C.S.'s parents as "having difficulty with [C.S.]" because "[h]e has become addicted to electronics, not so much gaming, but he was comfortable interacting online."[40]  C.S.'s parents reported, "It just got to the point that we had difficulty controlling the computer, and we were calling the police to calm him down."[41]  After the evaluation, Dr. Som diagnosed C.S. with Autism Spectrum Disorder, Attention Deficit Inattentive Type, Unspecified Anxiety Disorder.[42]

### III.   Administrative Review Process

### A.  Initial Denial and Level-One Appeal

On September 6, 2017, the Family submitted a pre-authorization request to Defendants seeking coverage for C.S.'s treatment at Daniels Academy.[43]  Two days later, on September 8, 2017, Premera responded to the Family denying the request on the basis that C.S.'s enrollment at Daniels Academy was not medically necessary.[44]  In the denial letter, Premera concluded C.S.'s enrollment was not medically necessary for two reasons.  First, because the intensity of C.S.'s symptoms did not meet the InterQual Criteria for treatment in a residential treatment center, and

---

[38] Dkt. 58 at 6.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] Dkt. 58 at 7.

[43] Dkt. 58 at 10–11.

[44] Dkt. 82 ¶ 39; Dkt. 58 at 10–11.

second, because the intensity of treatment C.S. received at Daniels Academy did not meet the

InterQual Criteria for a residential treatment center.[45]  Specifically, Premera explained,

> To make this decision, we reviewed your contract, the medical policy McKesson
> InterQual Criteria, BH: Child and Adolescent Psychiatry Interqual 2017, and the
> medical records your provider, Daniels Academy sent to us.  We have determined
> this service is considered not medically necessary. . . .
>
> The treatment guidelines we use state that residential treatment for a mental health
> condition is medically necessary when, because of a serious emotional
> disturbance, all of these situations are present:
>
> - You are so functionally impaired that you can't follow
>   instructions or ask for help to get your needs met, or you can't
>   control your behavior for more than 48 hours.
> - You cannot be managed safely in the community because, for
>   the last 6 months or longer, you have been repeatedly hurting
>   yourself, hurting others, damaging property, getting arrested,
>   running away to dangerous situations, or having other serious
>   psychiatric symptoms.
> - Your support system is not available, unsafe, not able to
>   manage your difficulties or keep you safe, or it was not helping
>   your treatment in a lower level of care.
>
> Residential treatment for a mental health condition is denied as not medically
> necessary.  Information from your provider does not show that you are currently
> so functionally impaired that you can't follow instructions or ask for help to get
> your needs met, or you can't control your behavior for more than 48 hours, and
> you cannot be managed safely in the community because, for the last 6 months or
> longer, you have been repeatedly hurting yourself, hurting others, damaging
> property, getting arrested, running away to dangerous situations, or having other
> psychiatric symptoms.  The information also does not show that your support
> system is not available, unsafe, not able to manage your difficulties or keep you
> safe, or was not helping your treatment in a lower level of care. . . .
>
> The treatment guidelines we use also state that, in addition to other requirements,
> residential treatment for a mental health condition is medically necessary only
> when:
>
> - A psychiatric evaluation is done within one business day of
>   admission, and then (add when necessary: by a psychiatrist)
>   [sic] at least one time per week.
> - A psychosocial evaluation is done within 48 hours of
>   admission.

---

[45] *See* Dkt. 82 ¶ 40; Dkt. 58 at 11.

- A substance use evaluation is done within 48 hours of admission.
- Clinical assessment by a licensed provider is done at least one time per day.
- You receive individual or group or family therapy at least three times per week.

The information from your provider shows one individual therapy session on 9/5/17, but otherwise does not show any of the evaluations or therapy services listed above.  The information does include a treatment plan, but a treatment plan does not show that evaluations or therapy services have actually been done. . . .[46]

Premera informed the Family they could appeal the denial if they disagreed with the decision.[47]

The Family appealed Premera's denial on February 27, 2018.[48]  In their appeal letter, the Family argued Premera's use of the InterQual Criteria "to deny or limit coverage is a violation of [the Plan] terms and provisions."[49]  Based on the Plan definition of eligible providers, the Family argued Daniels Academy "is an eligible provider that renders medically necessary treatment which meets [the Plan's] requirements for reimbursable mental health services."[50]

The Family also argued that it was "absolutely medically necessary" for C.S. to receive residential treatment at Daniels Academy.[51]  The Family included copies of C.S.'s medical records from Daniels Academy, ViewPoint, and selected records from Pacific Quest.[52]  They also included three letters in support of their appeal: (1) a letter from Chad Stark, a therapist who treated C.S. at ViewPoint; (2) a letter from Dr. Michael Connolly, a psychiatrist with experience in treating adolescents in subacute residential treatment centers; and (3) Erin Milhelm, a therapist

---

[46] *Id.*

[47] Dkt. 58 at 11–12.

[48] Dkt. 82 ¶ 41; Dkt. 58 at 12.

[49] Dkt. 57 (Family's Level I Appeal Letter) at 81 (sealed).

[50] *Id.*

[51] Dkt. 82 ¶ 42.

[52] *Id.*

who treated C.S. since 2010.[53]   The letter from Chad Stark detailed the events that necessitated

C.S.'s transfer to ViewPoint, specifically those taking place at the end of C.S.'s enrollment in

Pacific Quest and the initial attempt to send C.S. to Daniels Academy:

> [C.S.] had a few aggressive incidents.  The first was when he first got to PQ
> [Pacific Quest] where he was swinging a bamboo stick around and would not put
> it down.  It hit a staff [member] without him intending for it to.  [Staff member]
> referred [it] to like a 4 yr.-old swinging something around.  A couple of days ago
> they told him he was not going home and he did okay initially but later that day
> threw a plant at someone and was told not to.  He then threw a bucket toward staff
> and crawled into a tomato cage and told them they could not restrain him because
> he was in the cage.  The last night he was at PQ something occurred and he was in
> a hold.  [Provider] is not sure exactly what happened but it sounded like [C.S.]
> [was] not cooperative with the hold and a staff member got their lip split open.

> [C.S.] then went to Daniels and was to [be] admit[ted] today.  When they arrived
> he became upset and would not stay and was making threats that he was going to
> kill himself.  Daniels staff tried to process with [C.S.] but he tried to walk away;
> when staff did not engage and stopped walking after him he came back.  Daniels
> requested that he come to us for stabilization.[54]

The letter from Stark also indicated that he believed it was medically necessary for C.S. to

receive further residential treatment after leaving ViewPoint.[55]

The Letter from Dr. Connolly pushed back against Premera's use of the InterQual

Criteria to determine medical necessity for subacute residential treatment care.[56]   The letter from

Erin Milhelm further opined that it was medically necessary for C.S. to receive further residential

treatment.[57]

At the end of their appeal, the Family requested Defendants provide them with "a copy of

all documents under which the plan is operated," including: (1) "all governing plan documents";

---

[53] Dkt. 82 ¶¶ 43, 46, 49; Dkt. 58 at 12–13.

[54] Dkt. 82 ¶ 44; Dkt. 58 at 12–13.

[55] Dkt. 82 ¶ 45.

[56] Dkt. 82 ¶ 47; Dkt. 58 at 13.

[57] Dkt. 82 ¶ 49; Dkt. 58 at 12.

(2) "the summary plan description"; (3) "any insurance policies in place for the benefits we are seeking"; (4) "any administrative services agreements that exist"; and (5) "any mental health and substance use disorder treatment criteria (including skilled nursing facility and rehab criteria) utilized to evaluate the claim[.]"[58]  In response, Premera timely provided the Family with: (1) the relevant Summary Plan Description; and (2) the InterQual Criteria for Child and Adolescent Psychiatric Care at a Residential Treatment Center.[59]  On October 8, 2020, over a year and a half after the Family's initial request, Defendants produced the InterQual Criteria they used to evaluate medical necessity for pediatric patients at skilled nursing and inpatient rehabilitation facilities.[60]  Defendants never produced any administrative services agreements to the Family, including the agreement between Microsoft and Premera.[61]

Premera sent the Family's appeal to the Medical Review Institute of America (MRIoA) for review by an independent psychiatrist board-certified in General Psychiatry and Child and Adolescent Psychiatry.[62]  Premera also sent records for the psychiatrist to review including Premera's initial notice of denial, the Family's Level I Appeal letter and exhibits, and C.S.'s medical records from Pacific Quest, ViewPoint, and Daniels Academy.[63]

On March 13, 2018, the independent psychiatrist concluded that "[b]ased on the clinical information provided and the plan definition of medically necessary, the coverage for mental

---

[58] Dkt. 82 ¶ 51.

[59] *Id.* ¶ 52.

[60] *Id.* ¶ 54.

[61] *Id.* ¶ 53.

[62] Dkt. 58 at 13.

[63] *Id.*

health residential treatment would not be considered medically necessary for this patient."[64]  The

independent psychiatrist explained,

> The patient has a chronic history of temper outbursts and difficulties complying
> with behavioral expectations.  This review has to do with a question of whether it
> was necessary for the patient to be treated in a residential setting starting
> 08/31/17.  The available information indicates that the patient's symptoms were
> not of a severity to require the use of residential treatment, and he could have
> been treated safely and effectively in a less intensive setting.  The standard of care
> for this patient would have been a transition from the inpatient setting to a partial
> hospitalization program level of care.[65]

On March 26, 2018, Premera sent a letter to the Family upholding the previous denial of

C.S.'s claim for benefits received at Daniels Academy.[66]  This denial letter explained Premera

was upholding its previous denial because the intensity of C.S.'s symptoms did not meet the Plan

requirements for treatment to be medically necessary at a residential treatment center.[67]  The

letter explained the Family's appeal was reviewed by an independent physician who concluded

that extended residential treatment was not medically necessary under the terms of the Plan and

detailed the specific conclusions made by the physician.[68]  Premera also notified the Family that

they could seek Independent Review with the Office of Insurance Commissioner for Washington

State if they disagreed with Premera's determination.[69]

## B.  Level-Two Appeal

On July 10, 2018, the Family requested Premera's denials be reviewed by an external

review organization under the Washington Insurance Commissioner's mandate.[70]  The Family

---

[64] *Id.*

[65] Dkt. 82 ¶ 56; Dkt. 58 at 14.

[66] Dkt. 82 ¶ 55.

[67] *See* Dkt. 58 at 14–15.

[68] Dkt. 58 at 14.

[69] Dkt. 58 at 15.

[70] Dkt. 82 ¶ 61; Dkt. 58 at 15.

attached all of the documents in their external review request that were included in their first request for an internal review and again requested production of the documents they sought in their Level I Appeal letter.[71]

On July 27, 2018, the independent reviewer upheld Premera's denials, concluding C.S.'s treatment at Daniel's Academy was not medically necessary.[72]  The Independent reviewer explained the request was "not recommended for approval because [C.S.] had no objective noted, current mental problems that would have needed 24-hour care, supervision, observation, management, or containment."[73]

## IV.    Procedural History

Having exhausted their pre-litigation appeal obligations under ERISA and the Plan, the Family filed a Complaint with this court on March 20, 2019.[74]  The Family brings three causes of action in their Complaint: (1) a claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B); (2) a claim for violation of the Mental Health Parity and Addiction Equity Act, asserted under 29 U.S.C. § 1132(a)(3); and (3) a request for statutory penalties under 29 U.S.C. § 1132(a)(1)(A) and (c).[75]

On October 20, 2020, the Family filed a Motion to Compel seeking "complete and accurate" responses to discovery requests from Defendants.[76]  In it, the Family argued Defendants' discovery responses were incomplete because they "either agreed to provide documents and then failed to do so or requested clarification regarding discovery requests and

---

[71] Dkt. 82 ¶ 62.

[72] Dkt. 82 ¶ 63; Dkt. 58 at 15.

[73] *Id.*

[74] Dkt. 2 (Complaint).

[75] *Id.*

[76] Dkt. 50 (Family's Motion to Compel Discovery).

then never answered after receiving clarification."[77]  On November 18, 2020, the court took the

Motion under advisement and ordered the parties to meet and confer within ten days to reach a

resolution.[78]  If the parties were unable to resolve the discovery dispute, the court notified the

parties it would set the Motion for a hearing.[79]

On December 4, 2020, the deadline to file dispositive motions, Defendants filed their

Motion for Summary Judgment seeking judgment against the Family on all three causes of

action.[80]  That same day, the Family filed a Motion for Extension of Time Deadline for their

Motion for Summary Judgment.[81]  On December 16, 2020, the Family also filed a Motion to

Defer or Deny Defendants' Motion for Summary Judgment.[82]

With the two motions, the Family sought additional time to compel accurate discovery

responses from Defendants.[83]  Specifically, the Family contended Defendants' boilerplate

objections to discovery requests prevented the Family from knowing whether or not they were

withholding documents based on those objections.[84]  As an example, the Family noted they

requested Defendants "identify the medical necessity criteria you utilized for skilled nursing

facilities, sub-acute inpatient rehabilitation, and inpatient hospice claims from August 1, 2017, to

the present."[85]  In response, Defendants asserted various boilerplate objections and did not

---

[77] *Id.* at 2.

[78] Dkt. 54 (Order for Parties to Meet and Confer).

[79] *Id.*

[80] Dkt. 58 (Defendants' Motion for Summary Judgment).

[81] Dkt. 63 (Family's Motion for Extension of Time).

[82] Dkt. 67 (Family's Motion to Defer or Deny Defendants' Motion for Summary Judgment).

[83] *See* Dkt. 63 at 1; Dkt. 67 at 15.

[84] Dkt. 67 at 17.

[85] *Id.* at 16.

produce any criteria used to determine the medical necessity of inpatient hospice services.[86]  The

Family argued that although they had received the InterQual criteria for skilled nursing and

inpatient rehabilitation services,[87] based on Defendants' boilerplate response, they were unsure

whether Defendants utilized criteria for inpatient hospice services and were withholding that

criteria based on an objection or whether Defendants simply did not have criteria for inpatient

hospice services.[88]

On March 25, 2021, Magistrate Judge Romero heard oral argument on the Family's

Motion to Compel.[89]  At that hearing Defendants represented, "[W]e have produced every

document that we can find that could possibly be responsive to these requests."[90]  Specifically, in

response to the Family's contention that Defendants failed to produce "a medical policy for

subacute inpatient rehabilitation or inpatient hospice claims," Defendants represented, "We have

responded under oath that we do not have one of those.  It does not exist."[91]  At the close of the

hearing, the court denied the Family's Motion to Compel because they "failed to follow the

court's order to meet and confer" and did not meet their obligation to move the matter along.[92]

The court also granted the Family's Motion for Extension of Time Deadline for their Motion for

Summary Judgment after Defendants agreed to the extension, and denied as moot the Family's

56(d) Motion.[93]

---

[86] *See id.* at 16.

[87] *See Id.* at 16 n.88 (acknowledging "Defendants did produce at least some documents related to criteria for treatment at [inpatient rehabilitation] facilities").

[88] *Id.* at 17.

[89] Dkt. 80 (Minute Entry for Hearing on Family's Motion to Compel Discovery).

[90] Dkt. 85-1 (Transcript of Hearing) at 16:10–11.

[91] *Id.* at 17:19–25.

[92] *Id.* at 27:21–28:5.

[93] *Id.* at 28:23–29:4.

The Family filed their Cross-Motion for Summary Judgment on April 21, 2021.[94]  On July 14, 2021, the court held a hearing on the parties' respective Motions for Summary Judgment.  The Motions are now fully briefed and ripe for review.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[95]  When applying this standard, the court is to "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[96]

"Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[97]  If the moving party does not have the ultimate burden of persuasion at trial—here, Defendants on the Family's claims—that party "has both the initial burden of production . . . and the burden of establishing that summary judgment is appropriate as a matter of law."[98]  The moving party can meet its burden "either by producing affirmative evidence negating an essential element of the non-moving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."[99]

"[A] more stringent summary judgment standard applies," however, when the moving party has the burden of proof at trial.[100]  In that instance, the moving party "cannot force the

---

[94] Dkt. 82.  This Motion was filed as a joint Motion for Summary Judgment and Opposition to Defendants' Motion for summary judgment because the Family "observed [] their arguments opposing Defendants' Motion for Summary Judgment are substantively identical to [the Family's] arguments in favor of their own."  *Id.* at n.1.

[95] Fed. R. Civ. P. 56(a).

[96] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008) (citation omitted).

[97] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citations omitted).

[98] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citation omitted).

[99] *Id.* (citation omitted).

[100] *Id.* (citation omitted).

nonmoving party to come forward with specific facts showing there is a genuine issue for trial merely by pointing to parts of the record that it believes illustrate the absence of a genuine issue of material fact."[101]  Rather, "the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."[102]

## ANALYSIS

The Family brings three ERISA causes of action: (1) a claim for denial of benefits; (2) a claim for violation of the Mental Health Parity and Addiction Equity Act (Parity Act); and (3) a request for statutory penalties.[103]  The Family and Defendants cross move for summary judgment on the three claims.  The court addresses each in turn.

## I.        DENIAL OF BENEFITS

The Family's claim for denial of benefits arises under 29 U.S.C. § 1132(a)(1)(B), which allows an ERISA plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[104]  The Family argues reimbursement for C.S.'s treatment at Daniels Academy is a benefit due to them under the terms of the Plan.  Before discussing the parties' arguments as to the denial of benefits claim, the court first addresses the applicable standard of review.[105]

---

[101] *Id.* (citation omitted).

[102] *Id.* (internal quotation marks and citations omitted).

[103] Dkt. 2 (Complaint).

[104] 29 U.S.C. § 1132(a)(1)(B).

[105] *See LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir.2010) ("Like the district court, we must first determine the appropriate standard to be applied to [the administrator's] decision to deny benefits.") (internal quotation marks and citation omitted).

## A.  STANDARD OF REVIEW

When both parties move for summary judgment on a denial of benefits claim under ERISA, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[106]

The court reviews the administrative record "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[107]  If the plan gives the administrator or fiduciary discretionary authority, the court "employ[s] a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[108]  Under this standard, the court will uphold an administrator's determination "so long as it was made on a reasoned basis and supported by substantial evidence."[109]  This means the record supporting the administrator's decision must have "more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion."[110]  Defendants bear the burden to show the arbitrary and capricious standard of review applies to its benefits decision under the Plan "[a]s the party arguing for the more deferential standard of review[.]"[111]

---

[106] *Id.* (internal quotation marks and citation omitted).  The Family objects to Defendants' use of extra-record evidentiary support for arguments made in support of their Motion on the denial of benefits claim.  Dkt. 82 at 20. This objection is well taken, and the court constrains its analysis of this claim to factual materials found "solely [i]n the administrative record."  *See LaAsmar*, 605 F.3d at 796.

[107] *Id.* (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (internal quotation marks omitted).

[108] *Id.*  The Tenth Circuit uses the terms "arbitrary and capricious" and "abuse of discretion" interchangeably in the ERISA context.  *See Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 n. 10 (10th Cir.2008) (citation omitted).

[109] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018) (citation omitted).

[110] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (internal quotation marks and citation omitted).

[111] *See LaAsmar*, 605 F.3d at 796.

Neither party disputes that the Plan grants Premera discretionary authority to determine eligibility for Plan benefits and to construe the terms of the plan.[112]  The court therefore reviews the administrative record under the arbitrary and capricious standard of review.  Nevertheless, the Family contends the court should conduct a *de novo* review of the denial of benefits because of procedural irregularities that occurred during the benefit determination and appeal process.[113]  The court concludes the Family has failed to demonstrate a serious procedural irregularity warranting *de novo* review.

If an administrator violates the "minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries" implemented by the Department of Labor with "serious . . . irregularities[,]" courts apply a "*de novo* review where deferential review would otherwise be required[.]"[114]  However, "there is not a serious procedural irregularity requiring *de novo* review every time 'the plan administrator's conclusion is contrary to the result desired by the claimant.'"[115]  Rather, "*de novo* review may be appropriate if the benefit-determination process did not substantially comply with ERISA regulations."[116]

---

[112] Dkt. 58 at 17.  The Plan delegates discretionary authority to Microsoft as the Plan Administrator, and in turn to Premera as Microsoft's delegated Claim Administrator.  Dkt. 58 at 17, 18 ("The Plan Administrator shall have all powers necessary or appropriate to carry out its duties, including, without limitation, the sole discretionary authority to . . . interpret the provisions of the Plan and the facts and circumstances of claims for benefits" and "[c]laims shall be evaluated by the Plan Administrator or such other person or entity designated by the Plan Administrator as specified in the applicable Component Plans and shall be approved or denied in accordance with the terms of the Plan including the Component Plans.").

[113] Dkt. 82 at 25–26.

[114] *See Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015) (citations omitted); 29 C.F.R. § 2560.503-1(a) (setting forth the minimum requirements).

[115] *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1251 (D. Utah 2016) (quoting *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1214 n.2 (10th Cir. 2006); *see also Grosvenor v. Qwest Commc'ns Int'l*, 191 Fed. App'x 658, 662 (10th Cir.2006) (unpublished) ("A serious procedural irregularity is not present every time a plan administrator comes to a decision adverse to the claimant on conflicting evidence.")).

[116] *Hancock v. Metropolitan Life Ins. Co.*, 590 F.3d at 1152.  The court notes the Tenth Circuit has left open the question of whether the substantial compliance rule still applies under the revised 2002 ERISA regulations and has since declined to resolve the issue on several other occasions.  *Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818,

The Family urges the court to apply a *de novo* standard of review, arguing Defendants violated ERISA's minimum claim procedure regulations in four ways: (1) Premera failed to take the Family's Level I Appeal denial letter into account when reviewing the denial, (2) the Level I appeal denial failed to engage in a "meaningful dialogue" as required by ERISA's governing regulations, (3) each denial letter from Premera lacked sufficient explanation as to how the Plan terms relate to C.S.'s specific medical records, and (4) Premera's second denial indicated it did not afford any consideration to the opinions of C.S.'s treating professionals.[117]  The court will address each argument in turn.

First, the Family argues Premera did not take into account the letter supporting their Level I appeal when reviewing its initial denial of their claim.[118]  In support, the Family cites Premera's Level I appeal denial letter and asserts the letter "makes only a passing reference to [the Family's] appeal, noting that [the Family] referenced MHPAEA[.]"[119]  The Family contends Premera's denial does not engage with any other information submitted by the Family in their Level I appeal letter.[120]  The relevant ERISA regulations require administrators to "provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was

---

827–28 (10th Cir. 2008); *see, e.g., LaAsmar*, 605 F.3d at 800 ("We need not decide whether [the] 'substantial compliance' doctrine still applies to the revised regulation at issue here, 29 C.F.R. § 2560.503–1[.]"); *Hancock*, 590 F.3d at 1152 n.3 ("Because Ms. Hancock has failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA."); *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316 (10th Cir.2009) ("Because AIG has failed [the] substantial compliance test, . . . we need not decide whether a minor violation of the deadlines or other procedural irregularities would entitle the claimant to *de novo* review under the 2002 amendments.").  Because the court concludes the denial of benefits claim fails even under a de novo review, it need not reach the Family's arguments concerning whether the "substantial compliance" doctrine still applies under the 2002 ERISA regulations.

[117] Dkt. 82 at 26.

[118] *Id.*

[119] *Id.*

[120] *Id.*

submitted or considered in the initial benefit determination."[121]  "If a plan administrator fails to

gather or examine relevant evidence in accordance with this requirement, the court is to give less

deference."[122]  Here, the Family does not provide evidence to demonstrate Defendants failed to

provide such a review.  As noted by the Family, Premera's Level I Appeal denial letter

references an argument made by the Family in their appeal and explains why it disagrees with

the argument.[123]  This discussion seems to demonstrate Premera did take the Family's appeal

letter into account.  Although the Family may have preferred a more detailed response to their

appeal letter, Defendants' response to their Level I appeal does not demonstrate Defendants

failed to provide for a review that took their appeal letter into account.[124]  Accordingly, the court

finds no procedural irregularity on this basis.

In their next procedural-irregularity argument, the Family asserts "there is also no

evidence [Premera] engaged in the 'meaningful dialogue' with [the Family] that ERISA's

governing regulations require."[125]  Specifically, the Family argues Premera failed to "engage

with any of the questions [the Family] posited or any of the arguments [they] advanced."[126]  The

referenced "meaningful-dialogue requirement stems from subsections (g) and (h) of 29 C.F.R.

§ 2560.503-1."[127]  Subsection (g) requires a plan administrator to provide claimants with

---

[121] 29 C.F.R. § 2560.503-1(h)(2)(iv).

[122] *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1272 (D. Utah 2020) (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (internal quotation marks and citation omitted).

[123] *See* Dkt. 82 at 26 (citing Premera's appeal denial letter which states, "[I]n your appeal you referenced MHPAEA. Premera is compliant with MHPAEA regulations.  The evidentiary standards, processes, strategies, and other factors used to develop the criteria for intermediate level mental health services are the same as the processes, strategies, and other factors used to develop the criteria for intermediate level medical and surgical services.").

[124] *See* 29 C.F.R. § 2560.503-1(a) (explaining "this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries").

[125] Dkt. 82 at 26.

[126] *Id.*

[127] *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 588 (10th Cir. 2019) (unpublished) (citations omitted).

"notification of any adverse benefit determination."[128]   Notification must include, in relevant part, (1) "[t]he specific reason or reasons for the adverse determination;" (2) "[r]eference to the specific plan provisions on which the determination is based;" (3) "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;" and (4) "[a] description of the plan's review procedures and the time limits applicable to such procedures[.]"[129]

Subsection (h) of the ERISA regulation requires the Plan to "maintain a procedure by which a claimant shall have a reasonable opportunity to appeal [that] adverse benefit determination to an appropriate named fiduciary of the plan[.]"[130]   Under the appeal process, the fiduciary must provide "a full and fair review of the claim and the adverse benefit determination."[131]   Full and fair review requires a fiduciary of the plan, in relevant part, to "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim[.]"[132]

Here, Premera's failure to respond to the Family's appeal arguments and to answer their questions did not deny the Family a full and fair review of their claim as required by these ERISA regulations.   The Level I appeal denial letter from Premera seems to demonstrate it took the appeal letter into account.[133]   Premera also sent the appeal to the Medical Review Institute of America for review by an independent psychiatrist.[134]   That independent reviewer indicated they

---

[128] 29 C.F.R. § 2560.503-1(g)(1).

[129] Id. § 2560.503-1(g)(1)(i)–(iv).

[130] Id. § 2560.503-1(h)(1).

[131] Id.

[132] Id. § 2560.503-1(h)(2)(i)–(iv).

[133] See Dkt. 82 at 26 (noting Premera's "appeal denial letter makes only a passing reference to [the Family's] appeal"); Dkt. 58 at 23.

[134] Dkt. 83 (Defendants' Opposition and Reply) at 11.

received and reviewed the letters and medical records submitted by the Family in support of the

Level I appeal.[135]  The family does not cite any authority which requires Premera to engage with

the arguments made or the questions posed by them in their appeal.  Moreover, the Tenth Circuit

has acknowledged it is not aware of any authority requiring a claim administrator "to

affirmatively *respond* to these submissions.  Instead, subsection (h) merely required [Premera] to

'take[]' these [questions] and arguments 'into account.'"[136]  The Family has not demonstrated

Premera violated subsections (g) or (h) of the ERISA regulations or failed to engage in a

meaningful dialogue with them at the Level I appeal.  Accordingly, the court finds no procedural

irregularity on this basis.

Next, the Family contends Premera's initial notice of denial and Level I appeal denial

letter are procedurally irregular because they do not sufficiently explain how the Plan terms

relate to C.S.'s specific medical records.[137]  First, the Family asserts Premera's notice of adverse

benefit decision does not explain "how any of the Plan's terms were applied to any portion of

C.S.'s specific medical records."[138]  For claims denied based on medical necessity, subsection

(g) of 29 C.F.R. § 2560.503-1 requires Premera to include in its notice of an adverse benefit

determination "either an explanation of the scientific or clinical judgment for the determination,

applying the terms of the plan to the claimant's medical circumstances, or a statement that such

explanation will be provided free of charge upon request." [139]  The initial denial letter describes

the treatment guidelines—the InterQual Criteria Premera uses to determine medical necessity for

---

[135] *See* Dkt. 82 ¶¶ 57–59; Dkt. 83 at 9–10.

[136] *Mary D.*, 778 Fed. App'x at 589 (citing 29 C.F.R. § 2560.503-1(h)(2)(iv)) (emphasis in original).

[137] Dkt. 82 at 26.

[138] *Id.*

[139] 29 C.F.R. § 2560.503-1(g)(1)(v)(B).

residential treatment centers—and explains the "[i]nformation from your provider does not show that" C.S. meets those treatment guidelines.[140]  The denial further explained, "The information your provider sent about your problems are from before your previous residential treatment stay in a different residential treatment facility, not from the present time."[141]  The notice further supported the adverse benefits determination because, based on C.S.'s records sent by Daniels Academy, the treatment facility did not perform the intensity of treatment required by the InterQual criteria.[142]  Although somewhat briefly, the initial notice of denial applies the criteria to determine medical necessity under the Plan to C.S.'s medical circumstances.  Based on the initial denial letter, the Family has not demonstrated a procedural irregularity.

The Family also contends Premera's Level I appeal denial letter is procedurally irregular because it does not "reference the InterQual Criteria, and also does not explain how any of the Plan's terms were applied to any portion of C.S.'s specific medical records."[143]  This overstates Premera's obligations under ERISA to ensure the Family received a full and fair review of their appeal.[144]  As stated more fully above, a full and fair review requires administrators to provide plan participants with the opportunity to submit additional documents, make sure participants have reasonable access to information relevant to their claim, and provide for a review that takes into account all information submitted by the claimant in support of their claim.[145]  For a full and fair review on appeal, subsection (h) also requires "the appropriate named fiduciary [to] consult with a health care professional who has appropriate training and experience in the field of

---

[140] *See* Dkt. 58 at 11.

[141] *Id.*

[142] *Id.*

[143] Dkt. 82 at 26.

[144] *See* 29 C.F.R. § 2560.503-1(h).

[145] *Id.* § 2560.503-1(h)(2)(i)–(iv).

medicine involved in the medical judgment" for claims denied on the basis of medical necessity.[146]

After receiving the Family's appeal of the adverse benefit determination, Premera consulted with a board certified physician in Child/Adolescent Psychiatry associated with the Medical Review Institute of America.[147]   As requested by Premera, the physician made a determination of medical necessity independently of the InterQual Criteria, based on the Plan definition and clinical information provided.[148]   Although the Family seeks a more comprehensive explanation of Premera's denial decision applying C.S.'s medical records to the terms of the plan, ERISA's minimum procedural requirements for appealing an adverse benefit determination do not require an extensive discussion of reasoning.[149]   The record reflects Premera fulfilled this requirement in the Level I appeal denial letter where Premera attached the review by an independent psychiatrist who was board-certified in General Psychiatry and Child and Adolescent Psychiatry.[150]   Accordingly, the court disagrees with the Family that Premera procedurally erred on this basis.

The Family's last procedural-irregularity argument is that Premera did not afford any consideration to the opinions of C.S.'s treating professionals.[151]   As stated more fully above, ERISA requires a full and fair review of adverse benefit appeals, which includes "a review that takes into account all comments, documents, records, and other information submitted by the

---

[146] *Id.* § 2560.503-1(h)(3)(ii).

[147] Dkt. 58 at 14.

[148] *Id.*

[149] *See* 29 C.F.R. § 2560.503-1(h)(3)(ii).

[150] *See* Dkt. 58 at 13; Dkt. 82 ¶ 57.

[151] Dkt. 82 at 26.

claimant relating to the claim[.]"[152]  Thus, a full and fair review requires the administrator to take into consideration opinions of treating physicians submitted by the claimant where they relate to the claim.[153]  The Tenth Circuit has confirmed plan administrators "may not arbitrarily refuse to credit . . . opinions of treating physicians[,]" but they are also "not required to give special weight to the opinion of a treating physician."[154]

Here, the Family argues Premera did not review the letters from C.S.'s treating physicians at all, rather than simply failing to give the physicians special weight.[155]  The Family insists this conclusion is supported by Premera's Level I appeal denial letter.[156]  In it, Premera disclosed that it used the following documents to review the Family's appeal: "Medical Records," "[t]he benefits and exclusions from" the Plan, the relevant InterQual Criteria, and the report generated by the independent physician reviewer.[157]  The Family argues, because C.S.'s physician letters are not specifically named in this list, the appeal denial letter demonstrates Premera did not review them.[158]  Although the Family acknowledges the Level I appeal denial specifically states it reviewed C.S.'s "medical records," they insist this phrase is not expansive enough to encompass the letters from his treating physicians.[159]  Premera disagrees, maintaining that "clearly the provider records were among these 'medical records' and were reviewed as part

---

[152] 29 C.F.R. § 2560.503-1(h)(2)(iv).

[153] *See id.*

[154] *Buckardt v. Albertson's, Inc.*, 221 Fed. App'x 730, 737 (10th Cir 2007) (unpublished) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).

[155] Dkt. 82 at 26.

[156] *Id.*

[157] *Id.*

[158] *Id.*

[159] Dkt. 82 at 26; Dkt. 85 at 13.

of this case, as the independent reviewer listed them as such."[160]  Premera also argues they produced the provider letters to the independent reviewer who "specifically listed all the provider documents in his report."[161]

The court is unpersuaded by the Family's argument.  There is no evidence to suggest Premera's review of C.S.'s "Medical Records" did not include a review of the treating providers' letters of medical necessity.  The independent reviewer categorized the treating provider letters of medical necessity as part of C.S.'s "Records Received."[162]  Premera's failure to list each type of medical record received, does not constitute a "serious procedural irregularity" to warrant *de novo* review.[163]

For the reasons stated above, the court concludes Defendants have established they are entitled to have the administrative record reviewed under an arbitrary and capricious standard for the denial of benefits claim.[164]

## B.  DENIAL OF BENEFITS CLAIM

The Family contends Premera incorrectly denied benefits for C.S.'s treatment at Daniels Academy.  It is the Family's burden to establish a covered loss under the Plan.[165]  As discussed in the previous section, the court concludes Defendants are entitled to an arbitrary and capricious review of the record for this claim.  However, even considering the administrative record *de novo*, the court concludes the Family has failed to establish C.S.'s treatment at Daniels Academy was a covered benefit.  Under a *de novo* standard, the court determines "whether the

---

[160] Dkt. 83 at 5.

[161] *Id.* at 4–5.

[162] Dkt. 57 (Level I Appeal Denial Letter, MRIoA Physician Report) at 49 (sealed).

[163] *See Martinez*, 795 F.3d at 1215.

[164] *See LaAsmar*, 605 F.3d at 796.

[165] *See id.* at 800.

administrator made a correct decision."[166]  The relevant question "is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review."[167]

Before addressing the Family's argument as to entitlement to benefits, the court must address an initial argument made by the Family.  The Family argues the court should only consider Premera's intensity of functioning reason for denial, and not the intensity of treatment reason included in Premera's initial denial letter.[168]  The Family contends Defendants abandoned the intensity of treatment argument by not raising it again in the Level I appeal denial letter.[169] The court agrees.

As the claim administrator, Premera is "required by statute to provide a claimant with the specific reasons for a claim denial" in its initial notification of denial.[170]  This requirement limits the court to "consider only those rationales that were specifically articulated in the administrative record as the basis for denying a claim."[171]  Beyond the statutory obligation to give the "reason or reasons" in the initial denial, Defendants also have a contractual obligation to provide the "reason or reasons" for upholding the denial on appeal.[172]

---

[166] *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (quoting *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)).

[167] *Id.* at 833.

[168] Dkt. 82 at 29.

[169] *Id.*

[170] *Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (citing 29 U.S.C. § 1133); *see also* 29 C.F.R. § 2560.503-1(g)(1)(i).

[171] *Spradley*, 686 F.3d at 1140 (citing *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir.2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

[172] Dkt. 82 ¶ 10; *see also* Dkt. 59-1 (2017 Summary Plan Description) at 87 ("If your appeal is denied, you will receive a written notice setting forth: [t]he specific reason or reasons for the denial[.]").

In its initial denial, Premera denied coverage for C.S.'s treatment using the InterQual criteria to determine that neither C.S.'s level of functioning nor the level of treatment received at Daniel Academy met the requirements to be medically necessary under the plan.[173]  In their Level I appeal letter, the family challenged both reasons for denying benefits for C.S.'s treatment at Daniels Academy.[174]  In denying the Family's appeal, Premera relied solely on C.S.'s symptoms, without mention of Daniels Academy's eligibility for benefits as a residential treatment center.[175]  Where Premera failed to raise any reason for denial based on Daniels Academy's qualifications or services, Defendants "could hardly be caught by surprise by an insistence that it comply with its own plan."[176]  Because the Plan language required Premera to assert the "reason or reasons" for denial on appeal, and Premera listed only one reason for denial—C.S.'s intensity of symptoms—the court will also limit its review of the Family's denial of benefits claim to the Premera's single stated reason for denial.

The Family argues C.S.'s treatment at Daniels Academy was a covered benefit because it was "medically necessary" as defined by the Plan language and under the relevant InterQual Criteria.[177]  The court disagrees and concludes this argument is not supported by a preponderance of the evidence.

---

[173] *See* Dkt. 58 at 11; Dkt. 82 at ¶ 40.

[174] Dkt. 57 (Family's Level I Appeal Letter) at 81 (sealed) (citing the Plan language and arguing, "Daniels is an eligible provider that renders medically necessary treatment which meets our plan's requirement for reimbursable mental health services.").

[175] *See* Dkt. 57 (Premera's Appeal Denial Letter) at 46 (sealed).

[176] *See Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1201 (9th Cir. 2010) (quoting *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 132 (1st Cir. 2004)).

[177] Dkt. 82 at 28.

The Plan requires mental health treatment benefits be "medically necessary" for coverage.[178]  The Plan defines "medically necessary" as services that are: (1) essential to the diagnosis or treatment of a mental illness; (2) appropriate for the medical condition; (3) a medically effective treatment; (4) cost effective; (5) not primarily for research; (6) not primarily for the comfort of the enrollee or their family; and (7) not recreational or palliative therapy, except for treatment of terminal conditions.[179]  Premera also uses InterQual Criteria to evaluate whether certain services are medically necessary.[180]  To determine whether an extended stay (sixteen days or longer) at a residential treatment center is medically necessary, the relevant InterQual Criteria require certain indications of the beneficiary's functioning, treatment, and symptoms.[181]

As relevant here, the InterQual Criteria for care at a residential treatment center require at least one instance of the following for each week of treatment: school refusal or daily resistance to school attendance, an interpersonal conflict, repeated privilege restriction or loss of privileges, inability or unwillingness to follow instructions or negotiate needs, or unresponsive to staff direction or limits.[182]

To meet its burden, the family argues

C.S. persistently struggled to follow instructions without becoming argumentative or withdrawing, failed to respond to staff direction or limits, was easily frustrated, engaged in angry outbursts, suffered from persistent anxiety and depression, threatened suicide on several occasions, assaulted staff, and was involved in persistent altercations.[183]

---

[178] Dkt. 82 ¶ 4; Dkt. 58 at 7.

[179] Dkt. 82 ¶ 4; Dkt. 58 at 7–8.

[180] Dkt. 82 ¶ 5.

[181] *See id.* ¶ 6.

[182] *Id.*

[183] Dkt. 82 at 30.

The Family cited sixteen incidents occurring at Daniels Academy to support this argument.[184]
Neither this argument nor the supporting incidents demonstrate the medical necessity of C.S.'s
sixteen months of treatment at Daniels Academy under the weekly requirements of the InterQual
Criteria or the language of the Plan.  For example, the Family has not identified evidence of any
symptoms necessitating residential treatment on August 31, 2017, the day C.S. was admitted to
Daniels Academy, or anytime in the week before or after he was admitted to the program.[185]
The first day the record reflects any symptom criteria is September 13, 2017—two weeks after
C.S. was admitted to Daniels Academy.[186]  Based on the court's review of the administrative
record, the preponderance of the evidence does not support that C.S.'s symptoms met the
InterQual Criteria when he was admitted to Daniels Academy .  The court concludes Premera
made a correct benefits decision based on the language of the Plan and its use of the InterQual
Criteria to assess medical necessity.  Accordingly, Defendants are granted summary judgment on
the Family's claim for denial of benefits.

## II.    PARITY ACT CLAIM

The Family brings their claim for a violation of the Parity Act under 29 U.S.C.
§ 1132(a)(3), which allows an ERISA "participant, beneficiary, or fiduciary to enjoin any act or
practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain
other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of
this subchapter or the terms of the plan."[187]  Unlike the denial of benefits claim, the court affords
Defendants no deference in interpreting the Parity Act because the interpretation of a statute is a

---

[184] *Id.* ¶ 38.

[185] *See id.* ¶ 38(a) (noting first incident day at Daniels as September 13, 2017).

[186] *Id.*

[187] 29 U.S.C. § 1132(a)(3).

legal question.[188]  The court first discuss the Parity Act before addressing whether Defendants'

treatment limitations for benefits received at a residential treatment center violates the Act.

## A.  PARITY ACT

The Parity Act was "designed to end discrimination in the provision of coverage for

mental health and substance use disorders as compared to medical and surgical conditions in

employer-sponsored group health plans and health insurance coverage offered in connection with

group health plans."[189]  The Parity Act requires group health plans providing for both medical

and surgical benefits as well as mental health or substance use disorder benefits to ensure that,

> the treatment limitations applicable to such mental health or substance use
> disorder benefits are no more restrictive than the predominant treatment
> limitations applied to substantially all medical and surgical benefits covered by
> the plan (or coverage) and there are no separate treatment limitations that are
> applicable only with respect to mental health or substance use disorder benefits.[190]

In other words, if a group health plan provides both medical/surgical benefits as well as

mental health or substance use disorder benefits, then the plan may not apply any "treatment

limitation to mental health or substance use disorder benefits in any classification that is more

restrictive than the predominant . . . treatment limitation of that type applied to substantially all

medical/surgical benefits in the same classification."[191]  And if a plan "provides mental health or

substance use disorder benefits in any classification of benefits . . . , mental health or substance

---

[188] *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016) (citing *Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1233 (10th Cir.2012)).

[189] *Am. Psychiatric Ass'n v. Anthem Health Plans*, 50 F.Supp.3d 157, 160 (D. Conn. 2014) (quoting *Coal. for Parity, Inc. v. Sebelius*, 709 F.Supp.2d 10, 13 (D.D.C. 2010)).

[190] 29 U.S.C. § 1185a (a)(3)(A)(ii).

[191] 29 C.F.R. § 2590.712(c)(2)(i).

use disorder benefits must be provided in every classification in which medical/surgical benefits are provided."[192]

The regulations implementing the Parity Act clarify that "[t]reatment limitations include both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan."[193]  As it relates to nonquantitative limitations, the regulations provide that a plan may not apply more stringent "processes, strategies, evidentiary standards, or other factors" to mental health or substance use benefits than it does for medical/surgical benefits.[194]  Specifically, the regulations state a plan,

> may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan . . . as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.[195]

In other words, a plan or administrator violates the Parity Act if it applies a stricter nonquantitative treatment limitation to mental health or substance use disorder benefits than is applied to analogous medical/surgical benefits.[196]

---

[192] *Id.* § 2590.712(c)(2)(ii).  The regulation identifies six classifications of benefits used in applying the Parity Act rules: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs.  *Id.* § 2590.712(c)(2)(ii)(1–6).

[193] *Id.* § 2590.712(a).

[194] *Id.* § 2590.712(c)(4)(i).

[195] *Id.*

[196] *See id.*

## B.  THE FAMILY'S PARITY ACT CLAIM

The court now turns to whether Defendants' application of treatment limitations to

residential treatment center benefits violates the Parity Act.  To establish a claim for a Parity Act

violation, the Family must show:

> (1) the relevant group health plan is subject to the Parity Act; (2) the plan
> provides both medical/surgical benefits and mental health or substance use
> disorder benefits; (3) the plan includes a treatment limitation for mental health or
> substance use disorder benefits that is more restrictive than medical/surgical
> benefits; and (4) the mental health or substance use disorder benefit being limited
> is in the same classification as the medical/surgical benefit to which it is being
> compared.[197]

The dispute here is limited to the latter two elements.[198]  The parties agree that the

relevant treatment limitation—medical necessity—is a nonquantitative treatment limitation as

defined by the Parity Act regulations.[199]  Nonquantitative treatment limitations are more

restrictive than medical/surgical benefits where the "processes, strategies, evidentiary standards,

or other factors used in applying the . . . treatment limitation to mental health [benefits] . . . are

applied [] more stringently than, [those] used in applying the limitation with respect to

medical/surgical benefits in the classification."[200]

The Family argues Defendants' use of InterQual Criteria to apply the medical necessity

treatment limitation to benefits received at residential treatment centers makes the limitation

more restrictive as applied to mental health services than medical/surgical benefits in the same

---

[197] *Michael D. v. Anthem Health Plans of Kentucky, Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019), *appeal dismissed sub nom. Michael D. v. Anthem Health Plans of Kentucky*, No. 19-4033, 2019 WL 4316863 (10th Cir. 2019) (quoting *A.H. by & through G.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387, at *6 (W.D. Wash. June 5, 2018)) (recognizing "there is no clear law on what is required to state a claim for a Parity Act violation" and explaining the quoted elements are the "baseline standard[s] followed by many courts").

[198] *See* Dkt. 82 at 35 ("Plaintiffs contend that the first and second element of this test are not in dispute.").

[199] Dkt. 85 at 17–18; Dkt. 58 at 33; *see also* 29 C.F.R. § 2590.712(c)(4)(ii)(A) (including limits "based on medical necessity" as nonquantitative treatment limitations).

[200] 29 C.F.R. § 2590.712(c)(4)(i).

classification.[201]  In support of this argument, the Family identifies three medical/surgical

benefits offered under the plan that are in the same classification as residential treatment centers:

skilled nursing, inpatient rehabilitation, and inpatient hospice facilities.[202]  The Family contends

Defendants do not use InterQual Criteria to apply the medical necessity treatment limitation to

inpatient hospice benefits.[203]  Instead, Defendants use only the Plan language itself to determine

---

[201] Dkt. 82 at 35–36.

[202] *Id.* at 35.

[203] *Id.* at 35–36.  In their Motion, the Family also identify inpatient rehabilitation facilities as an analogous medical/surgical benefit and argue Defendants only use the Plan language to apply the medical necessity treatment limitation.  *Id.*  Defendants respond that the Family is "simply mistaken" and assert they do use InterQual Criteria to apply the treatment limitation to inpatient rehabilitation facilities.  Dkt. 83 at 26.  Ultimately, the Family does not dispute that Defendants use InterQual Criteria to assess the medical necessity of inpatient rehabilitation benefits.  Dkt. 85 at 16–17.  Rather, they argue Defendants should not be permitted to rely on these criteria to defend against the Parity Act violation because of Defendants' misrepresentations to the court that these criteria do not even exist.  *Id.*

Indeed, Defendants twice represented to the court that these criteria do not exist for inpatient rehabilitation benefits.  First, Defendants represented in their Opposition to the Family's Motion to Defer or Deny Defendants' Motion for Summary Judgment that Defendants have "no medical policy" for inpatient rehabilitation benefit claims.  Dkt. 71 (Defendants' Opposition to Motion to Defer or Deny Motion for Summary Judgment) at 3 (citing the January 13, 2021 Declaration of Gwendolyn Payton stating, "Premera has no medical policy for sub-acute inpatient rehabilitation.").  Next, at the March 25, 2021 hearing before Judge Romero, Defendants represented they have no "medical policy for subacute inpatient rehabilitation" and went on to state, "We have responded under oath that we do not have one of those.  It does not exist.  Now, if for some reason the existence of that document is important to Plaintiffs' claim, they get to run with the benefit of the fact that Premera never did it, didn't make it and it does not exist."  Dkt. 85-1 (Transcript of Hearing) at 17:19–18:4.  In stark contrast to these prior representations, Defendants solely rely on their medical policy, i.e. the InterQual Criteria, as a defense to the Parity Act claim based on a comparison between residential treatment centers and inpatient rehabilitation facilities.  *See* Dkt. 83 at 26 (citing the May 19th Declaration of Gwendolyn Payton stating an "accurate copy of the 2017 InterQual Criteria for Subacute Rehabilitation" was produced to the Family on October 8, 2020).  Further, when made aware of the prior representations in response to their reliance on the InterQual Criteria, Defendants did not cure their misrepresentation.  *See* Dkt. 85 at 14–15 (quoting the prior misrepresentations).  Indeed, counsel for Defendants has made no effort to correct Defendants' prior misstatements.

However, the court declines to strike this evidence from consideration because, prior to the misrepresentations to the court, both parties acknowledged the existence of the evidence.  *See* Dkt. 63 at 16 n.88 (noting "that Defendants did produce at least some documents related to criteria for treatment at [inpatient rehabilitation] facilities."); Dkt. 53 at 1 (explaining "the medical policies for inpatient rehabilitation facilities demanded by Plaintiffs" was produced by Defendants).  Thus, any prejudice to Plaintiffs attendant to relying on Defendants' misrepresentations is reduced because Plaintiffs were aware of the existence of these criteria.  Further, even considering the evidence, the court concludes the application of InterQual Criteria to residential treatment centers violates the Parity Act because it is more stringent than the process used to determine medical necessity for inpatient hospice benefits.  Nevertheless, the court remains concerned with Defendants' misrepresentations and takes this opportunity to remind counsel of their professional obligation of candor to the court.  *See* Utah R. Professional Responsibility 3.3; DUCivR 83-1(d) ("An attorney who practices in this court must comply with the Local Rules of Practice, . . . Utah Rules of Professional Conduct and Utah Standards of Professionalism and Civility.").

whether inpatient hospice benefits are medically necessary.[204]  The Family urges Defendants'

application of the InterQual Criteria to apply the treatment limitation to residential treatment

center benefits is more restrictive than the process to determine medical necessity for inpatient

hospice benefits because there are no additional criteria beyond the Plan language required to

determine medical necessity for these benefits.[205]  Where the process used to apply the medical

necessity treatment limitation—the InterQual Criteria—is more stringent as applied to mental

health benefits than it is as applied to a medical/surgical benefit in the same classification, the

Family argues Defendants have violated the Parity Act.[206]  The court agrees.

Defendants make two arguments to avoid this conclusion: (1) inpatient hospice benefits

are not an appropriate medical/surgical analog for Parity Act purposes; and (2) even if they are

analogous, Defendants insist the treatment limitation is not more restrictive as applied to

residential treatment centers.  The court will take each argument in turn.

First, Defendants contend inpatient hospice benefits are not analogous medical/surgical

benefits in the same classification as residential treatment center benefits.[207]  Defendants argue

inpatient hospice care is "not an equivalent comparative analogue to residential treatment

centers" because it is not mentioned in the Final Rules implementing the Parity Act.[208]  Indeed,

the Final Rules interpreting the Parity Act identify skilled nursing facilities and rehabilitation

hospitals as examples of analogous levels of care to residential treatment centers.[209]

---

[204] Dkt. 82 at 35–36.

[205] *Id.*

[206] *Id.*

[207] Dkt. 83 at 30.

[208] *Id.*

[209] Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi-State Plan Program, 78 Fed. Reg. 68247 (Nov. 13, 2013).  The court notes that while many have come to accept as a matter of law that skilled nursing facilities and inpatient rehabilitation are the relevant analog to residential treatment for mental health, there is nothing statutorily

Specifically, the Rules explain "[f]or example, if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit."[210]  But, as made clear by this language, these services are provided as examples of comparable benefits within a classification rather than an exhaustive list of comparable benefits.[211]

It is not obvious to the court that inpatient hospice care, as covered by the Plan, is in the same classification as residential treatment centers.[212]  Neither party has identified any binding authority that dictates a result either way.  However, to determine whether medical/surgical benefits are in the same classification as mental health benefits for Parity Act analyses, district courts regularly look to the "level of treatment" rather than the specific type of treatment provided at the facility.[213]  Applying this framework, courts in this District have routinely

requiring this.  The relevant consideration for determining analogs is whether treatments within the same classification, for example inpatient, out-of-network, meet the requirements of the Parity Act.  *See* 29 C.F.R. § 2590.712(c)(2)(ii).  What those treatments are is inherently plan specific and may vary from case to case based on the language of the plan at issue.  *See id.* at 68243 (explaining "pairing specific mental health or substance use disorder benefits with specific medical/surgical benefits is a static approach that the Departments do not believe is feasible, given the difficulty in determining "equivalency" between specific medical/surgical benefits and specific mental health and substance use disorder benefits and because of the differences in the types of benefits that may be offered by any particular plan.").

[210] Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi-State Plan Program, 78 Fed. Reg. 68247 (Nov. 13, 2013).

[211] *Id.*

[212] *See id.* at 68243 (explaining the determination of benefits classification is made by "pairing specific mental health or substance use disorder benefits with specific medical/surgical benefits is a static approach that the Departments do not believe is feasible, given the difficulty in determining 'equivalency' between specific medical/surgical benefits and specific mental health and substance use disorder benefits and because of the differences in the types of benefits that may be offered by any particular plan").

[213] *Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207, 1236 n.13 (D. Utah 2019) (recognizing "the proper Parity Act analysis is not whether the 'exact type of care'" a claimant receives at a mental health facility is "the same [they] could have received at a medical/surgical facility; rather, it is whether [the administrator] uses less restrictive criteria for coverage for the analogous 'level of care' in a medical/surgical treatment facility than it did for mental health/substance abuse treatment.").

39

recognized inpatient hospice treatment as providing a level of medical/surgical treatment that is analogous to the level of treatment at residential treatment centers.[214]  Defendants elected not to engage with this framework (or any other analytical framework) in their papers, choosing to argue instead only that inpatient hospice is not analogous to residential treatment centers because it is not separately included in the non-exhaustive list of examples in the Final Rules. Defendants offer no additional argument to explain why impatient hospice benefits do not offer the same level of treatment as residential treatment centers under the terms of the Plan. Confining itself to the arguments presented by Defendants, the court disagrees with Defendants that on the specific record before it the only analogous medical/surgical benefits for residential treatment centers are skilled nursing and inpatient rehabilitation facilities.  Therefore, the court assumes for purposes of resolving the cross motions before it that inpatient hospice facilities offer an analogous level of care and are in the same classification as residential treatment centers.

Defendants next argue that even if inpatient hospice benefits are analogous medical/surgical benefits to residential treatment center benefits, the use of InterQual Criteria to assess medical necessity for residential treatment centers does not violate the Parity Act.[215] Defendants contend that although they do not use InterQual Criteria to apply the medical necessity treatment limitation to hospice benefits, the language of the Plan is just as stringent as

[214] *See David S.*, 2020 WL 5821203, at *5 (concluding "discovery regarding inpatient hospice . . . is relevant to the [] [p]laintiffs' Parity Act claim" for residential mental health treatment programs) (citations omitted); *Johnathan Z. v. Oxford Health Plans*, Case No. 2:18-cv-383-JNP-PMW, 2020 WL 607896, at *15 (D. Utah Feb. 7, 2020) (accepting inpatient hospice care as an analogous medical/surgical level of care for wilderness therapy and transitional living care) (citations omitted); *David P. v. United Healthcare Ins. Co.*, Case No. 219-cv-00225-JNP-PMW, 2020 WL 607620, at *17 (D. Utah Feb. 7, 2020) (recognizing "this court has also consistently analogized mental health/substance abuse residential treatment centers to medical/surgical inpatient hospice and rehabilitation facilities"); *Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207, 1236 n.13 (D. Utah 2019) (agreeing with the plaintiffs that inpatient hospice care is an analogous medical/surgical treatment "level of care" to mental health residential treatment facilities); *B.D. v. Blue Cross Blue Shield of Georgia*, Case No. 1:16-cv-00099-DN, 2018 WL 671213, at *10 (D. Utah Jan. 31, 2018) (using skilled nursing, rehabilitation services, and hospice care as medical/surgical analogs to residential treatment centers for Parity Act claim).

[215] Dkt. 83 at 30.

40

the additional InterQual Criteria for residential treatment centers because the language of the Plan requires a beneficiary to be dying before hospice benefits are deemed medically necessary.[216]  The court is not persuaded by this argument.

To determine whether residential treatment center benefits are medically necessary, Defendants first rely on the language of the Plan.[217]  Beyond the language of the Plan, Defendants also impose the appropriate InterQual Criteria as an evidentiary standard to apply the medical necessity treatment limitation to residential treatment center benefits.[218]  For inpatient hospice benefits, Defendants solely use the language of the Plan to determine if the benefits are medically necessary.[219]  Defendants do not use any additional process or criteria beyond the terms of the Plan.[220]

In other words, claimants seeking medical/surgical benefits for inpatient hospice care have one less hurdle to clear.  Claimants in this classification of benefits must meet one criterion to meet the medical necessity requirement: the Plan language.  On the other hand, claimants seeking mental health benefits in the same classification—residential treatment centers—must satisfy both the Plan language and the additional InterQual Criteria.  This makes the nonquantitative treatment limitation of medical necessity more restrictive as applied to mental health benefits.[221]  This outcome is specifically what the Parity Act was enacted to prevent.[222]

---

[216] *Id.*

[217] Dkt. 82 ¶ 4; Dkt. 58 at 7.

[218] Dkt. 82 ¶ 6; Dkt. 58 at 9.

[219] Dkt. 82 ¶ 8; *see also* Dkt. 58 at 30–31 (explaining the Plan language for medically necessary hospice care).

[220] *Id.*

[221] 29 C.F.R. § 2590.712(c)(4)(i) (explaining Parity Act violations based on nonquantitative treatment limitations look to the "processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits" both "as written and in operation").

[222] *See Am. Psychiatric Ass'n v. Anthem Health Plans*, 50 F. Supp. 3d 157, 160 (D. Conn. 2014) (quoting *Coal. for Parity, Inc. v. Sebelius*, 709 F.Supp.2d 10, 13 (D.D.C. 2010)) ("The Parity Act was 'designed to end discrimination in the provision of coverage for mental health and substance use disorders as compared to medical and surgical

Because the additional InterQual Criteria are applied to determine whether residential treatment center benefits are medically necessary, the court concludes the treatment limitation is applied more restrictively to mental health benefits than as applied to analogous medical/surgical benefits covered by the Plan.  This violates the Parity Act.[223]

As for the appropriate remedy, the Family cursorily argues the court should award "equitable relief in the form of an injunction, specific performance, disgorgement, restitution, surcharge, or some combination of those remedies."[224]  The Family also argues remand of their claim to the Defendants is inappropriate because "[t]here is no basis to suggest that remand to an ERISA plan administrator when it is found to have wrongly denied medical benefits under the terms of the plan is a form of relief that was typically available in courts of equity."[225] Defendants do not address the appropriate remedy for a Parity Act violation.

To aid in determining the appropriate equitable relief for Defendants' Parity Act violation, the court ORDERS the Family to file supplemental briefing concerning the remedy to which they are entitled.  The Family's brief must be submitted by August 24, 2021.  Defendants are invited to respond 14 days thereafter.

### III.    STATUTORY PENALTIES

The Family's third cause of action requests statutory penalties under 29 U.S.C. § 1132(c). This section "is the penalty provision applicable where the court finds a violation of" 29 U.S.C. § 1024, an ERISA disclosure provision.[226]  These sections, 29 U.S.C. §§ 1024 and 1132(c), "were

---

conditions in employer-sponsored group health plans and health insurance coverage offered in connection with group health plans.'").

[223] 29 U.S.C. § 1185a(a)(3)(A)(ii).

[224] Dkt. 82 at 40.

[225] *Id.*

[226] *Moothart v. Bell*, 21 F.3d 1499, 1503 (10th Cir. 1994).

included in ERISA so that plan participants and beneficiaries would be in a position to make informed decisions about how best to protect their rights."[227]

The relevant disclosure provision, 29 U.S.C. § 1024(b)(4), requires plan administrators to provide participants with a copy of certain documents if the participant requests them in writing, including "the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."[228]  To establish a violation of this provision, a claimant must demonstrate (1) the participant submitted a written request for information, (2) that information is within the scope of 29 U.S.C. § 1024(b)(4), and (3) the administrator failed or refused to provide the information within 30 days after the request.[229]

If the administrator fails to provide the participant with information within the scope of the ERISA disclosure provision after 30 days from the request, the plan administrator "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."[230]  While the statute initially set the maximum daily penalty at $100 per day, it has since been raised to $110 per day.[231]

The Family's claim for penalties primarily involves two sets of documents: (1) the InterQual Criteria for medical/surgical benefits including skilled nursing and inpatient rehabilitation facilities; and (2) the Administrative Services Agreement between the Plan

---

[227] *Id.* (citation omitted).

[228] 29 U.S.C. § 1024(b)(4).

[229] *See* 29 U.S.C. § 1132(c)(1)(B); *see also Utah Alcoholism Found. v. Battelle Pac. Northwest Labs.*, 204 F. Supp. 2d 1295, 1308 (D. Utah 2002).

[230] 29 U.S.C. § 1132(c)(1)(B).

[231] *See* 29 C.F.R. §2575.502c-1.

Administrator, Microsoft, and the Claims Administrator, Premera.[232]  The family submitted a written request to Defendants seeking these documents on February 27, 2018.[233]  Defendants did not produce the InterQual Criteria for pediatric patients at skilled nursing and inpatient rehabilitation facilities until October 8, 2020.[234]  Defendants have never produced the ASA.[235]  The Family seeks statutory penalties for Defendants' failure to provide these documents within 30 days of requesting them.[236]  Defendants contend that neither of the requested documents are within the scope of 29 U.S.C. § 1024(b)(4), the ERISA disclosure provision.[237]  The court disagrees.

First, the InterQual Criteria for skilled nursing and inpatient rehabilitation facilities are plainly within the scope of 29 U.S.C. § 1024(b)(4) as "instruments under which the Plan is . . . operated[.]"[238]  The ERISA Parity Act regulations make clear that under the disclosure provision,

> [i]nstruments under which the plan is established or operated include documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.[239]

Before the Department of Labor issued this Parity Act regulation in 2014, the scope of documents subject to 29 U.S.C. § 1024(b)(4)'s "instruments under which the plan is . . .

---

[232] Dkt. 82 at 38; Dkt. 85 at 18.

[233] Dkt. 82 ¶¶ 41, 51.

[234] *Id.*

[235] *Id.* at ¶ 53.

[236] *See* Dkt. 39.

[237] Dkt. 58 (Defendants' Motion) at 37.

[238] *See* 29 U.S.C. § 1024(b)(4).

[239] 29 C.F.R. § 2590.712(d)(3).

operated" language was the subject of a circuit split.[240]  The majority of circuits adopted a narrow interpretation, concluding "instruments under which the plan is operated" was comprised of only formal legal documents.[241]  Under this construction evaluation criteria, such as the InterQual Criteria, likely would not be covered by the provision.[242]  However, the Parity Act regulations were amended and now make clear that evaluation criteria for analogous medical/surgical benefits, such as the InterQual Criteria for skilled nursing and inpatient rehabilitation facilities, are specifically within the scope of this provision.[243]

The Parity Act regulations also align with the design of ERISA's disclosure provisions: to place plan participants and beneficiaries "in a position to make informed decisions about how best to protect their rights."[244]  The regulation provides implementing guidelines for the Parity Act, which, as discussed above, affords plan participants seeking mental health benefits certain rights and protections under ERISA.[245]  The medical necessity criteria that the regulation requires to be produced under § 1024(b)(4) provide participants with information essential to protecting and making decisions about their rights under ERISA and the Parity Act.[246]

---

[240] *Compare Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653–54 (4th Cir. 1996) (concluding "instruments under which the plan is established or operated" is to be interpreted narrowly to include only "formal or legal documents under which a plan is set up or managed" and not "all documents that provide information about the plan and benefits" because the unambiguous language demonstrates the provision was to be limited and not establish a presumption of disclosure), *with Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1070 (6th Cir. 1994) (noting "instruments" should be construed broadly because, consistent with the purpose of ERISA's disclosure provisions, "courts should favor disclosure where it would help participants understand their rights").

[241] *See Murphy v. Verizon Communs., Inc.*, 587 F. App'x 140, 143 (5th Cir. 2014) ("The majority of courts, however, have adopted an even stricter construction of the catch-all clause, concluding that it applies only to formal legal documents.").

[242] *See Doe v. Travelers Ins. Co.*, 167 F.3d 53, 60 (1st Cir. 1999) (holding that mental health guidelines used by a plan to evaluate medical necessity were not instruments under which the plan was operated subject to § 1024(b)(4) because they were not "formal legal documents that underpin the plan.").

[243] *See* 29 C.F.R. § 2590.712(d)(3).

[244] *Moothart*, 21 F.3d at 1503.

[245] *See* 29 U.S.C. § 1185a(a)(3)(A).

[246] 29 C.F.R. § 2590.712(d)(3).

Notwithstanding the plain language and intent of this regulation, Defendants maintain the InterQual Criteria for analogous medical/surgical benefits is beyond the scope of the ERISA disclosure provision.[247]  In advancing this argument Defendants incorrectly rely on an ERISA regulation governing claim processing to narrow their obligation to disclose documents to include only the information "relied upon in making the adverse [benefit] determination."[248] Defendants are simply incorrect that compliance with this ERISA regulation fulfills their obligation under 29 U.S.C. § 1024(b)(4).  This ERISA disclosure provision requires plan administrators to provide information requested by beneficiaries at any time, and includes information beyond just that used during claims processing.[249]  The court concludes evaluation criteria used to determine medical necessity for analogous medical/surgical benefits is within the scope of 29 U.S.C. § 1024(b)(4) and must be provided to plan participants upon written request.[250]  Because Defendants dispute neither that the Family requested the medical/surgical analog InterQual Criteria, nor that Defendants failed to provide the Family with that information until over a year and a half after the initial request, statutory penalties are warranted pursuant to 29 U.S.C. § 1132(c).

Second, the court concludes the Administrative Services Agreement (ASA) falls within the scope of 29 U.S.C. § 1024 as a "contract, or other instrument[] under which the plan is established or operated."[251]

---

[247] Dkt. 83 at 32.

[248] *Id.* at 33 (quoting 29 C.F.R. § 2560.503-1(g)(1)(v)(A)).

[249] *See* 29 U.S.C. § 1024(b)(4).

[250] 29 C.F.R. § 2590.712(d)(3).

[251] 29 U.S.C. § 1024(b)(4).

The Tenth Circuit has yet to provide guidance concerning how trial courts should decide whether an agreement like the ASA falls within the scope of the ERISA disclosure provisions. However, other circuit courts considering the issue have concluded the answer depends on the administrative organization of the plan.  For example, the Seventh Circuit has held "[w]here the administration of a plan is divided," for instance between a plan administrator and a claims administrator, "the extent of each administrator's authority is basic information that a plan participant needs to know."[252]  In those circumstances, an administrative services agreement governing the relationship between administrators is an instrument under which the plan is operated, subject to the production requirements of § 1024(b)(4).[253]  The court finds this reasoning persuasive.

The Family contends the ASA is "clearly" an "instrument[] under which the plan is established or operated," subject to the disclosure requirements of 29 U.S.C. § 1024(b)(4).[254]  At oral argument, the Family relied on the plain language of 29 U.S.C. § 1024(b)(4) to demonstrate how the ASA is a contract essential to understanding how the Plan operates because the responsibilities of the Plan and Claim administrators are divided and each effect the Family's rights under the plan.

Defendants disagree, arguing the Family's request for the ASA "far exceeded" the scope of ERISA's disclosure requirements.[255]  Defendants rely heavily on the Ninth Circuit's decision

---

[252] *Mondry v. Am. Family. Mut. Ins. Co.*, 557 F.3d 781, 796 (7th Cir. 2009).  Defendants cite this case for the proposition that ASAs must only be disclosed to plan participants under 29 U.S.C. § 1024(b)(4) when governing the relationship between two third-party administrators.  Dkt. 82 at 32 n.3.  This case does not support Defendants' proposition.  Nowhere in the opinion does the court assert the rule Defendants claim it does.  Rather, the Seventh Circuit's holding was based on an employer/plan administrator's agreement with a claim administrator, precisely the facts of this case.  *See Mondry*, 557 F.3d at 784.

[253] *See id.*

[254] Dkt. 85 at 18.

[255] Dkt. 58 at 37.

in *Hively v. BBA Aviation Benefit Plan*, to argue the ASA is not subject to disclosure under 29 U.S.C. § 1024.[256]  There, the Ninth Circuit concluded that where an administrative service agreement governs only the relationship between a plan and an administrator, "not the relationship between the plan participants and the provider," the agreement is "not subject to disclosure under § 1024(b)(4)."[257]  This conclusion was based on Ninth Circuit precedent defining the scope of 29 U.S.C. § 1024 to exclude documents "relat[ing] only to the manner in which the plan is operated[.]"[258]  However, the language of 29 U.S.C. § 1024 is disjunctive, covering documents "under which the plan is established *or* operated."[259]  Where the Ninth Circuit narrows the scope of documents subject to this disclosure provision to only those documents under which the plan is both established and operated, the court does not find the Ninth Circuit's interpretation persuasive.[260]  The *Hively* holding is not binding authority on this court, and the court declines Defendants' invitation to follow that precedent here.

Based on the plain language of the statute and the language of the Plan itself, the facts of this case demonstrate the ASA falls within the scope of the ERISA disclosure provision, 29 U.S.C. §1024(b)(4).[261]  Microsoft and Premera both have obligations and responsibilities

---

[256] Dkt. 83 at 32.

[257] *Hively v. BBA Aviation Benefit Plan*, 331 F. App'x 510, 511 (9th Cir. 2009).

[258] *Id.* (quoting *Shaver v. Operating Eng'rs Local 428 Pension Trust Fund*, 332 F.3d 1198, 1202 (9th Cir. 2003)).

[259] *See* 29 U.S.C. § 1024(b)(4) (including within its scope documents "under which the plan is established or operated") (emphasis added).

[260] *See Hively*, 331 F. App'x at 511 (quoting *Shaver*, 332 F.3d at 1202) ("Documents which 'relate only to the manner in which the plan is operated' are not subject to disclosure under § 1024(b)(4).").

[261] 29 U.S.C. § 1024(b)(4) ("The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.").

48

under the Plan that bear on the rights of plan participants.[262]  Because of this division of responsibilities, the ASA between Mircosoft and Premera affects "the relationship between the plan participants and the provider[,]"[263] and is necessary for the Family to "know[] exactly where [they] stand[] with respect to the plan."[264]  The court concludes that the ASA was a "contract, or other instrument[] under which the plan is . . . operated."[265]  Accordingly, the ASA falls within the scope of the disclosure requirements of 29 U.S.C. § 1024(b)(4) and Defendants had an obligation to provide it within 30 days upon request of the Family.

Having concluded Defendants violated their obligations under the relevant ERISA disclosure provision, the court next considers the appropriate formulation of the penalty.  Under 29 U.S.C. § 1132(c)(1)(B) the imposition of penalties is subject to the discretion of the court.[266]  Ultimately, the penalty provision provides the court with a mechanism to punish past violations and deter future failures to abide by ERISA's disclosure requirements.[267]  The penalty statute focuses "necessarily on the plan administrator's actions, not the participant's."[268]

There are several non-dispositive factors the court may consider when deciding whether and how to exercise its discretion: "(1) the administrator's bad faith or intentional conduct; (2) the length of the delay; (3) the number of requests made; (4) the extent and importance of the

---

[262] *See* Dkt. 58 at 17–18 (explaining that Microsoft as the plan administrator "has the exclusive responsibility and complete discretionary authority to control the operation and administration of this plan," and has properly delegated its authority for claims administration to Premera).

[263] *Hively*, 331 Fed. App'x at 511.

[264] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989).

[265] *See* 29 U.S.C. § 1024(b)(4).

[266] *See Boone v. Leavenworth Anesthesia, Inc.*, 20 F.3d 1108, 1111 (10th Cir. 1994).

[267] *See Dalton v. Chs/Cmty. Health Sys.*, Case No. 2:12-cv-0412-BSJ, 2014 WL 4257855, at *1 (D. Utah Aug. 14, 2014).

[268] *Moothart*, 21 F.3d at 1506–07.

documents withheld; and (5) the existence of any prejudice to the participant or beneficiary."[269]
In the Tenth Circuit, "neither prejudice nor bad faith is required for a district court to impose
penalties," under § 1132(c) but, "the presence or absence of these factors can certainly be taken
into account[.]"[270]

The court concludes each factor supports imposing a meaningful penalty here.  First,
Defendants' conduct throughout this litigation supports a suggestion of bad faith.  The
unambiguous language of the Parity Act regulations requires documents like the InterQual
Criteria to be disclosed under § 1024.[271]  When faced with this language, Premera did not
acknowledge or engage with their duty to disclose these evaluation criteria under the relevant
regulations.  The Family attributes Defendants' failure to produce covered documents to a
misunderstanding of what the law requires.[272]  This is a plausible, if charitable, characterization
of sophisticated Defendants with the benefit of counsel possessing subject matter expertise.  As
demonstrated by Defendants' reliance on regulations applicable only to claims processing, they
may have been laboring under a misapprehension as to what the relevant law demands.[273]
However, the failure to engage with the regulation even after it was clearly presented in the
Family's briefing, suggests an intentional effort to avoid that duty and create ambiguity where
there is none.

---

[269] *McDonald v. Pension Plan of NYSA-ILA Pension Tr. Fund*, 320 F.3d 151, 163 (2d Cir. 2003) (citations omitted);
*see also Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3rd Cir. 2002) (recognizing the "[a]ppropriate factors
to be considered in making these decisions include bad faith or intentional conduct on the part of the administrator,
the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to
the participant or beneficiary.") (internal quotation marks and citation omitted)).

[270] *Deboard v. Sunshine Mining & Ref. Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000).

[271] 29 C.F.R. § 2590.712(d)(3).

[272] Dkt. 85 at 18.

[273] *See* Dkt. 58 at 31 (citing 29 C.F.R. § 2560.503-19(g)(v)(A)).

Further, instead of complying with their duty to disclose the documents when requested, Defendants forced the Family to engage in time consuming and costly discovery disputes narrowed almost specifically to encompass the InterQual Criteria they are entitled to under the Parity Act regulations.[274]  This reluctance to disclose the InterQual Criteria during the claims processing administrative procedure and further resist disclosure during discovery weighs in favor of finding bad faith,[275] especially when combined with Defendants' concerning reversal before the court about the existence of InterQual Criteria for inpatient rehabilitation facilities under the Plan until the same Criteria provided a basis for Defendants' contemplated defense.[276]

The length of delay and number of requests also support imposition of significant statutory penalties.  More than three years have passed since the Family first requested the ASA and evaluation criteria on February 27, 2018.[277]  On July 10, 2018, the Family asked for these documents a second time during the appeal of their claim denial.[278]  On November 1, 2019, the Family again sought the InterQual Criteria through discovery.[279]  Defendants objected to this discovery and responded they "cannot respond without further clarification."[280]  On July 23, 2020, the Family responded with a Meet-and-Confer letter providing more detail, explaining that they were seeking evaluative criteria for medical/surgical analogues under the Parity Act, and

---

[274] *See, e.g.*, Dkt. 50 (Motion to Compel); Dkt. 63 (seeking an extension of time to file the Family's Motion for Summary Judgment based on incomplete discovery responses); Dkt. 67 (asking the court to defer or deny consideration of Defendants' Motion for Summary Judgment based on incomplete discovery).

[275] *See Moothart*, 21 F.3d at 1506 (citing as support for a finding of bad faith the district court's observation "that rather than simply providing the documents and concluding the matter, the defendants were adamant about fighting [the beneficiary's] efforts.").

[276] *See* Dkt 85 at 14–15 (describing representations to the court concerning InterQual Criteria for inpatient rehabilitation).

[277] Dkt. 82 ¶¶ 41, 51.

[278] *Id.* ¶¶ 61, 62.

[279] *See* Dkt. 67 ¶ 1.

[280] *Id.* ¶¶ 3–8.

51

again requesting this information.[281]  Defendants represented to the Family they would respond in writing to the Meet-and-Confer letter.[282]  Defendants did not respond in writing.[283]  Instead, on October 8, 2020, they disclosed 4,311 pages of documents, without explanation as to which documents were responsive to each discovery request.[284]  The Family then filed a Motion to Compel, in part, to get access to this information.[285]  During the hearing for the Motion to Compel, Defendants made misrepresentations concerning what documents had been disclosed.[286]  This left the Family with the impression that Defendants do not use evaluative criteria for inpatient rehabilitation facilities, an impression that could have been remedied at any point by providing the criteria and affirmatively disclosing that Defendants rely on the criteria to determine medical necessity for those benefits.[287]  Rather than acknowledging their misrepresentation, Defendants in their summary judgment briefing remarkably fault the Family for relying on Defendants' own representations and make no effort to correct their misrepresentation to the court and to the Plaintiffs.[288]  At bottom, instead of fulfilling their obligation to disclose the requested documents under § 1024, Defendants forced the Family to repeatedly fight for access to the documents for over three years.

Moreover, the set of documents requested by the Family was discrete and important to their rights under ERISA.  The ASA and InterQual Criteria each are important to put the Family

---

[281] *Id.* ¶ 9.

[282] *Id.* ¶ 11.

[283] *Id.* ¶ 12.

[284] *Id.* ¶ 14; Dkt 53 at 1.

[285] Dkt. 50.

[286] *See* Dkt 85 at 14–15 (describing representations to the court concerning InterQual Criteria for inpatient rehabilitation).

[287] *See id.* at 15.

[288] Dkt. 83 at 25–26 (arguing the Family is "simply mistaken" as to whether Premera uses InterQual Criteria for inpatient rehabilitation facilities).

"in a position to make informed decisions about how best to protect their rights."[289]  The ASA between Microsoft and Premera details the division of responsibilities between the Plan Administrator and the Claims Administrator.  This division is important for the Family to know where they stand in relation to the plan, where to send claims, which party they need to request plan documents from, and other information necessary to make informed decisions under the Plan.[290]  Further still, the InterQual Criteria used to assess medical necessity for the medical/surgical analogous benefits were not only important to the Family but were dispositive of the Family's Parity Act claim.  Unlike some cases, the Family here has not requested an onerous amount of information unrelated to their ERISA rights.[291]  Rather, the Family sought a relatively discrete number of documents that were highly relevant to their rights under the Plan and decisions about how to proceed in the face of Defendants' denial of Plan benefits.

Defendants' failure to produce the ASA and the InterQual Criteria also prejudiced the Family by interfering with their ability to understand and protect their rights under ERISA, and needlessly prolonging litigation.  For example, Defendants' failure to produce the InterQual Criteria prejudiced the Family in their ability to assert and vindicate their rights under the Parity Act.  It was not until May 19, 2021, that Defendants affirmatively notified the Family they indeed utilize InterQual Criteria for inpatient rehabilitation facilities and planned on asserting that criteria as a defense to the Family's Parity Act claim.[292]  Even then, as noted above, it was only in connection with using those very Criteria to present Defendants' chosen defense.  By

---

[289] *See Moothart*, 21 F.3d at 1503.

[290] *See id.*

[291] *See Kerber v. Qwest Group Life Ins. Plan*, 656 F.Supp.2d 1279, 1297 (D. Colo. 2009) (concluding penalties were not warranted in part because "there is not dispute that the [requested documents] did not relate to any of the Plaintiffs in th[e] lawsuit" and the two documents withheld "represent[ed] a very small portion of the [869] documents that" were disclosed as requested).

[292] *See* Dkt. 83 at 25–26.

then, the Family had been requesting the Criteria for over three years and Defendants had

represented in court that they do not use criteria to determine medical necessity for inpatient

rehabilitation facilities.[293]  For almost all of that time, the Family was in the dark about

information that was ultimately dispositive of their Parity Act claim.  Rather than having that

information throughout the claim process, appeal, and discovery, the Family had fourteen days to

respond in their Reply memorandum.[294]  Further, Defendants' failure to provide the ASA has

caused, and continues to cause prejudice to the Family.  Without that information, the Family is

unaware of the obligations of each Defendant as to their implementation of the Plan, processing

of claims, and communication with beneficiaries.  For example, throughout the claim process,

appeal, and into litigation, the Family was required to send ERISA document requests to both

Microsoft and Premera without knowing which party was required to respond.  The court

concludes this prejudice to beneficiaries is the kind of harm the discretionary imposition of

penalties is meant to punish and deter.[295]

        In short, the Family requested a discrete set of documents from Defendants, to which they

were entitled under the ERISA disclosure provision, multiple times over the last three years.

Instead of disclosing these documents, Defendants were adamant about fighting the Family and

were dishonest about what they had and relied on in their claims administration process.  With so

little required of Defendants to disclose these documents, and in light of the importance of these

---

[293] *See* Dkt 85 at 14–15 (describing representations to the court concerning InterQual Criteria for inpatient rehabilitation).

[294] *See* DUCivR 7-1(b)(3) (providing for fourteen days to file a reply memorandum).

[295] *Bruch*, 489 U.S. at 118 (noting that "Congress' purpose in enacting the ERISA disclosure provisions" was "ensuring that the individual participant knows exactly where he stands with respect to the plan.") (internal quotation marks and citation omitted).

documents to the Family, Defendants' needless frustration of Plaintiffs' efforts supports a meaningful penalty.

The Family requests the court impose the maximum penalty provided by the statute of $110 per day, for two different penalty periods: one for the InterQual Criteria and another for the ASA.[296]  Exercising its discretion, the court concludes it is appropriate to calculate the penalty imposed based on two separate violations of the statute.  But the court also finds that imposing the statutory maximum penalty for both violations would impermissibly exceed the purpose of the statute.

The court concludes that Defendants failed to satisfy their disclosure obligations and in doing so interfered with the Family's ability to understand and protect their rights under ERISA. For this, the court imposes a penalty of $100 per day from February 27, 2018—the date of the Family's first written request—through the date of this Order for Defendants' failure to disclose the ASA.  Although Defendants also failed to provide the Family with the requested InterQual Criteria from February 27, 2018, through October 8, 2020, the court will not impose simultaneous penalties per violation for withholding both documents for the period from February 27, 2018 through October 8, 2020.  Subtracting thirty days for the period in which Defendants could have timely responded to Plaintiffs' requests, Defendants' delay totals 1231 days.  This brings the total statutory penalty to $123,100.

## IV.   PREJUDGMENT INTEREST AND ATTORNEYS' FEES AND COSTS

Finally, the Family seeks an award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and requests an opportunity to provide further briefing on the matter.[297]  Prejudgment

---

[296] Dkt. 82 at 39.

[297] *Id.* at 41.

interest is available in an ERISA case "because [it] permits a participant to seek 'appropriate equitable relief.'"[298]   Calculating the rate for prejudgment interest "rest[s] firmly within the sound discretion of the trial court."[299]   ERISA also allows reasonable attorneys' fees to either party under 29 U.S.C. § 1132(g).[300]   The district court may, in its discretion, award fees and costs where the fee claimant has achieved "some degree of success on the merits."[301]   However, courts should not grant attorney's fees under this provision as a matter of course.[302]   The court will allow the Family to submit briefing and support for claimed costs and fees only as to the Parity Act and the statutory penalty claims.  Plaintiffs' brief must be submitted by September 7, 2021.  Defendants have thirty (30) days to respond.

[298] *Weber v. GE Group Life Ass. Co.*, 541 F.3d 1002, 1016 (10th Cir. 2008) (citing 29 U.S.C. § 1132(a)(3)(B)).

[299] *Id.* (citation omitted).

[300] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 244 (2010) (citing 29 U.S.C. § 1001 et seq.; 29 U.S.C. § 1132(g)(1)).

[301] 29 U.S.C. § 1132(g).

[302] *B.D. v. Blue Cross Blue Shield of Georgia*, Case No. 1:16-cv-00099-DN, 2018 WL 671213, at *13 (D. Utah Jan. 31, 2018) (citing *McGee v. Equicor–Equitable HCA Corp.*, 953 F.2d 1192, 1209 (10th Cir. 1992)).

**CONCLUSION**

For the reasons stated above, the court GRANTS in part and DENIES in part the Family's Motion for Summary Judgment.[303]  The court also GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.[304]  The court orders additional briefing as described above on the appropriate remedy for Defendants' Parity Act violation, and invites a motion from Plaintiffs for attorneys' fees and costs.

SO ORDERED this 10th day of August 2021.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[303] Dkt. 82.

[304] Dkt. 58.

57