IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| M. S., L. S., and C.J.S.,<br><br>Plaintiffs,<br><br>v.<br><br>PREMERA BLUE CROSS, MICROSOFT CORPORATION, and the MICROSOFT CORPORATION WELFARE PLAN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.: 2:19-cv-00199-RJS-CMR<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

This case arises out of Defendants'— Premera Blue Cross (Premera), Microsoft Corporation (Microsoft), and the Microsoft Corporation Welfare Plan (the Plan)—alleged improper denial of coverage of residential mental health treatment for Plaintiff C.J.S. The court previously granted, in part, Plaintiffs' Motion for Summary Judgment, finding Defendants had violated the Mental Health Parity and Addiction Equity Act (Parity Act).[1]

Now before the court are Plaintiffs' Supplemental Brief Concerning Appropriate Parity Act Equitable Remedies[2] and Plaintiffs' unopposed Motion for Award of Prejudgment Interest, Attorneys' Fees, and Costs.[3] For the reasons explained herein, the court finds Plaintiffs are not entitled to any additional remedy for Defendants' Parity Act violation. Considering Defendants' non-opposition,[4] the court GRANTS Plaintiffs' Motion for $69,240 in attorneys' fees and $400 in costs.

---

[1] Dkt. 90 at 36–42.

[2] Dkt. 95 (Redacted); Dkt. 97 (Sealed).

[3] Dkt. 102.

[4] Dkt. 105.

1

## BACKGROUND

Plaintiffs M.S., L.S., and C.J.S. (collectively the S. Family) live in King County, Washington.[5] M.S. and L.S. are C.J.S.'s parents.[6] M.S. is employed by Microsoft, which provides the S. Family with group health coverage through the Plan.[7] C.J.S. was a beneficiary of the Plan.[8] The Plan designates Microsoft as the Named Fiduciary and Plan Administrator.[9] Pursuant to the Plan documents, Microsoft delegated its claim procedure duties to the claim administrator, Premera.[10]

C.J.S. received residential mental health treatment at Daniels Academy, in Utah, from August 31, 2017, through December 22, 2018,.[11] On September 6, 2017, the S. Family submitted a pre-authorization request to Defendants, seeking coverage for C.S.'s treatment at Daniels Academy.[12] Premera denied the request on the basis that C.S.'s enrollment at Daniels Academy was not medically necessary.[13] After exhausting their pre-litigation appeal obligations under ERISA and the Plan terms, the S. Family filed a Complaint with this court on March 20, 2019.[14]

---

[5] Dkt. 2, *Complaint* ¶ 1.

[6] Dkt. 2 ¶ 1, Dkt. 58 at 3.

[7] *See* Dkt. 2 ¶ 5; Dkt. 58, *Defendants' Motion for Summary Judgment* at 3; *see also* Dkt. 95, *Plaintiffs' Supplemental Brief Concerning Appropriate Parity Act Equitable Remedies* at 2 ("Plaintiff M.S. continues to be employed by the Microsoft Corporation and is still a Plan participant.").

[8] Dkt. 2 ¶ 5; Dkt. 58 at 3.

[9] *See* Dkt. 2 ¶ 4; Dkt. 58 at 18.

[10] *See* Dkt. 2 ¶¶ 2–3; Dkt. 58 at 19.

[11] *See* Dkt. 2 ¶ 6; Dkt. 58 at 7.

[12] Dkt. 58 at 11–12.

[13] Dkt. 82, *Plaintiffs' Motion for Summary Judgment* ¶¶ 39–40; Dkt. 58 at 11–12.

[14] Dkt. 2.

## PROCEDURAL HISTORY

The S. Family brought claims for: (1) recovery of benefits under ERISA 29 U.S.C. § 1132(a)(1)(B), (2) violation of the Parity Act 29 U.S.C. § 1132(a)(3), and (3) statutory penalties under 29 U.S.C. § 1132(a)(1)(A) and (C). Plaintiffs and Defendants filed cross-Motions for Summary Judgment.[15] On August 10, 2021, the court granted Plaintiffs' Motion for Summary Judgment as to their claims for violation of the Parity Act and for statutory penalties, and denied Defendants' Motion as to the same.[16] The court granted Defendants' Motion for Summary Judgment as to Plaintiffs' claim for recovery of benefits under ERISA and denied Plaintiffs' Motion as to the same.[17]

The court found Defendants had violated the Parity Act by applying more stringent nonquantitative treatment limitations to claims for residential mental health treatment than for medical treatment of the same classification—namely inpatient hospice care. In addition to the Plan language, Defendants impose "InterQual Criteria" as an evidentiary standard to determine the medical necessity of residential mental health treatment benefits.[18] In contrast, for inpatient hospice care, Defendants use only the Plan language to determine medical necessity without interposing any additional process or criteria.[19] The court found this disparity makes the nonquantitative treatment limitation of medical necessity more restrictive as applied to mental health benefits than to analogous

---

[15] Dkt. 82; Dkt 58.

[16] Dkt. 90 at 41–42, 54–55.

[17] *Id.* at 33.

[18] *See* Dkt. 82 ¶ 6; Dkt. 58 at 10.

[19] *See* Dkt. 82 ¶ 8; Dkt. 58 at 31–32.

medical/surgical benefits covered by the Plan.[20] This disparity violates the Parity Act.[21]

Having concluded that Defendants violated the Parity Act, the court ordered the parties to submit supplemental briefing concerning the appropriate equitable remedy.[22] Plaintiffs filed their Supplemental Brief Concerning Appropriate Equitable Remedies on September 9, 2021,[23] and Defendants filed their Opposition on September 30, 2021.[24] The court heard oral argument on May 17, 2022.[25]

For the reasons described herein, the court finds Plaintiffs are not entitled to any additional remedy for Defendants' Parity Act violation.

## LEGAL STANDARD

ERISA provides for civil enforcement by plan participants, beneficiaries, or fiduciaries "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan[.]"[26] This provision encompasses enforcement of the Parity Act, as incorporated into ERISA, and serves as a "safety net, offering appropriate equitable relief for injuries caused by violations that [the section] does not elsewhere adequately remedy."[27] However, the "equitable relief" available is limited to "those categories

---

[20] Dkt. 90 at 41.

[21] 29 U.S.C. § 1185a(a)(3)(A)(ii).

[22] Dkt. 90 at 42.

[23] Dkt. 95 (Redacted); Dkt. 97 (Sealed).

[24] Dkt. 104.

[25] Dkt. 108, *Minute Entry for Proceedings on May 17, 2022*.

[26] 29 U.S.C. § 1132(a)(3).

[27] *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).

of relief that were *typically* available in equity[.]"[28]

## ANALYSIS

Plaintiffs argue they are entitled to some combination of "declaratory and injunctive relief, specific performance, surcharge, disgorgement, or equitable restitution" to redress Defendants' Parity Act violation.[29] Specifically, Plaintiffs seek: (1) injunctive relief preventing Defendants' continued use of the InterQual Criteria to evaluate claims for residential mental health treatment,[30] (2) specific performance ordering Defendants to re-evaluate C.J.S.'s treatment claims without applying the InterQual Criteria,[31] (3) surcharge in the amount of $217,085.90 to compensate their losses resulting from Defendants' Parity Act violation,[32] and/or (4) disgorgement or restitution in the amount of $211,757.00 to compensate their out-of-pocket payment for C.J.S.'s treatment.[33]

Defendants respond that "Plaintiffs are not entitled to any remedy" for Defendants' Parity Act violation.[34] Defendants object to each form of relief requested by Plaintiffs, asserting: (1) Plaintiffs have not demonstrated they face irreparable future harm absent an injunction,[35] (2) re-evaluation of C.J.S.'s treatment claims would be futile because his residential treatment was not

---

[28] *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 219 (2002) (emphasis in original) (quoting *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 256 (1993)).

[29] Dkt. 95 at 2.

[30] *Id.* at 4–7.

[31] *Id.* at 7–8.

[32] *Id.* at 8–9.

[33] *Id.* at 9–10.

[34] Dkt. 104 at 11.

[35] *Id.* at 7–10.

medically necessary under the Plan terms,[36] and (3) Plaintiffs' quasi-contract claims (for surcharge, disgorgement, and restitution) are preempted by ERISA.[37]

The court considers each of Plaintiffs' requested forms of redress in turn.

### 1. Injunctive Relief

"For a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."[38] Plaintiffs assert they have "met all four elements entitling them to permanent injunctive relief," preventing Defendants from continuing to violate the Parity Act.[39] Defendants do not contest Plaintiffs' success on the merits of their Parity Act claim or that the requested injunction would not be adverse to the public interest.[40] Rather, Defendants assert Plaintiffs have not shown they face a future risk of irreparable harm and thus both lack Article III standing and fail to meet the elements required to obtain an injunction.[41] The court agrees with Defendants.

Article III standing requires a plaintiff to demonstrate that "(1) it has suffered an 'injury

---

[36] *Id.* at 3–7.

[37] *Id.* at 11.

[38] *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007)).

[39] Dkt. 95 at 6. Plaintiffs also briefly argue the court could require Defendants to provide it with comparative analyses, prepared according to 29 U.S.C. § 1185a(a)(8)(A), as proof of compliance with such an injunction. *Id.* at 7. But Plaintiffs provide no argument as to why analyses under this provision of ERISA, which directs for comparative analyses of nonquantitative treatment limitations to be prepared and made available to the Secretary of Labor, should feature as part of the civil enforcement scheme under § 1132(a)(3). Additionally, as Defendants note, there is no evidence they have failed to make such analysis available to the Secretary, in violation of § 1185a(a)(8)(A). Dkt. 104 at 9–10.

[40] *See* Dkt. 104 at 7–10.

[41] *Id.*

in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[42] To have standing to seek prospective injunctive relief, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future."[43] "The threatened injury must be certainly impending and not merely speculative. A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction."[44]

Here, Plaintiffs have failed to demonstrate that their threatened injury is certainly impending rather than speculative or conjectural. Plaintiffs argue that, "because [M.S.] is still employed by Microsoft and still a participant under the Plan[,]" he would be irreparably injured if Defendants are allowed to continue violating the Parity Act by applying disparate treatment limitations to residential mental health treatment.[45] This argument suffers multiple failures of proof. There is no evidence in the record that C.J.S. still receives residential mental health treatment or intends to seek such treatment in the future.[46] Furthermore, Plaintiffs have not

---

[42] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[43] *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014) (quoting *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004)).

[44] *Tandy*, 380 F.3d at 1283–84.

[45] Dkt. 95 at 5.

[46] *See, e.g.*, *Colo. Cross Disability Coal.*, 765 F.3d at 1211 ("In two affidavits, Ms. Farrar averred that she 'intend[s] to . . . return to' the Park Meadows Hollister, and that she 'will likely be going to the Park Meadows Mall at least six times per year.' This . . . suggests a concrete, present plan to return to the Park Meadows Hollister[.]") (internal citation omitted); *Tandy*, 380 F.3d at 1284 ("Allen's averred intent to use Wichita Transit's buses 'several times per year' is not a mere someday intention. Speculative, someday intentions do not support standing to seek prospective relief. Allen's testimony of an intent to use buses 'several times per year' suggests a concrete, present plan to use Wichita Transit's fixed-route buses several times each year, including the year in which she made that statement.").

argued, let alone provided evidence, that absent an injunction, Defendants are likely to continue violating the Parity Act. Thus, Plaintiffs have failed to demonstrate that, absent an injunction, they face a continued or repeat threat of actual or imminent injury.

Additionally, Defendants argue Plaintiffs should not be granted an injunction that extends to Plan members other than the Plaintiffs because "[t]his is not a class action lawsuit" and Plaintiffs have not demonstrated that such breadth is necessary to give them relief.[47] The court need not determine the availability of such an injunction because, even assuming Plaintiffs are entitled to pursue injunctive relief as to all Plan participants, they have failed to prove the requisite injury to obtain an injunction.

### 2. Specific Performance

Next, Plaintiffs request specific performance in the form of a court order compelling Defendants to re-evaluate C.J.S.'s claims for the residential mental health treatment he received "using only the terms of the Plan, without applying the InterQual Criteria."[48] Defendants concede that re-evaluation "is an appropriate remedy,"[49] but argue that doing so here would be futile because C.J.S's residential mental health treatment "was not medically necessary under the Plan terms, without regard to the InterQual [C]riteria[.]"[50] The court agrees with Defendants.

"[S]pecific performance is never demandable as a matter of absolute right, but as one

---

[47] Dkt. 104 at 10 (citing *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) ("Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown. On the other hand, an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled.")).

[48] Dkt. 95 at 8.

[49] Dkt. 104 at 3.

[50] *Id.* at 7.

which rests entirely in judicial discretion, to be exercised [] according to the settled principles of equity . . . and always with reference to the facts of the particular case."[51] It is an equitable remedy requiring "some attention to the relative benefits and burdens that the parties may enjoy or suffer[.]"[52] "Specific performance will not be compelled 'if under all the circumstances it would be inequitable to do so.'"[53] Such circumstances include, among others, where a defendant can show that "the plaintiff is not entitled to the relief he asks [for]."[54]

Here, the utility of ordering Defendants to re-evaluate of C.J.S.'s claims implicates the question whether such re-evaluation, without application of the InterQual Criteria, would yield a different outcome. That is, but for Defendants' application of the InterQual Criteria in violation of the Parity Act, whether C.J.S.'s residential mental health treatment would have been covered under the terms of the Plan.[55] In some cases, the record before the court may be unclear as to whether reconsideration in compliance with the Parity Act would yield a different outcome.[56] Such uncertainty may militate in favor of ordering re-evaluation of the treatment claims. But this is not such a case.

It appears from the record that re-evaluation of C.J.S.'s treatment claims would only lead to reaffirmation of Defendants' denial of coverage for lack of medical necessity. This is because

---

[51] *Haffner v. Dobrinski*, 215 U.S. 446, 450 (1910).

[52] *Texas v. New Mexico*, 482 U.S. 124, 131 (1987).

[53] *Id.* (quoting *Wesley v. Eells*, 177 U.S. 370, 376 (1900)).

[54] *Haffner*, 215 U.S. at 450.

[55] *See, e.g., Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 958 (9th Cir. 2014) ("'The beneficiary can pursue the remedy that will put the beneficiary in the position he or she would have attained but for the trustee's breach.'") (discussing *Skinner v. Northrop Grumman Retirement Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012).

[56] *See, e.g., Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1263 (D. Utah 2016) (remanding to the plan administrator "to evaluate in the first instance whether it owes the F. Family benefits . . . based on the Administrator's interpretation of the Plus Plan's terms.").

9

Defendants have in effect already re-evaluated C.J.S.'s claims, without applying the InterQual Criteria, and reached the same conclusion denying coverage.[57] In response to the S. Family's Level I Appeal, Premera requested external physician review to determine medical necessity independent of the InterQual Criteria.[58] The reviewing physician concluded that "[t]here was no medical necessity for the residential treatment episode in question . . . due to a failure to meet the [P]lan language definition of medically necessary treatment."[59] In response to the S. Family's Level II Appeal, an external reviewer again upheld Premera's denial of benefits after determining that the request was "not considered to be medically necessary" under the Plan definition.[60]

The Plan defines "medically necessary" as covered services meeting certain criteria, including:

> (1) It is essential to the diagnosis or treatment of an illness [] or condition that is harmful or threatening to the enrollee's life or health, . . . .
> (2) It is appropriate for the medical condition as specified in accordance with authoritative medical or scientific literature and generally accepted standards of medical practice.
> (3) It is a medically effective treatment of the diagnosis . . .
> (4) It is cost-effective, as determined by being the least expensive of the alternative supplies or levels of service that are medically effective and that can be safely provided to the enrollee. A health intervention is cost-effective if no other available health intervention offers a clinically appropriate benefit at a lower cost. . . .[61]

In response to Plaintiffs' Level I Appeal, the reviewing physician applied the Plan

---

[57] *See* Dkt. 104 at 6–7 (citing Dkt. 90.).

[58] *See* Dkt. 90 at 26–27; Dkt. 57, *SEALED Administrative Record* at 49–54 (March 26, 2018 letter from Premera in response to the S. Family's Leve I Appeal).

[59] Dkt. 57 at 51 (Sealed); *see also* Dkt. 90 at 13–14.

[60] Dkt. 57-10, *SEALED Notice of Final External Review Decision* at 109; *see also* Dkt. 90 at 15.

[61] Dkt. 82 ¶ 4; Dkt. 58 at 8.

definition and C.J.S.'s clinical information and found that, "[f]or the patient's symptoms upon admission to the residential treatment center, the use of this level of care was not the least restrictive setting in which treatment could have been effectively delivered."[62] The reviewing physician elaborated that, because "[t]he use of a residential treatment center could have been omitted and the patient could have still received safe and appropriate treatment[,]" it was "not essential to the patient's treatment."[63] Furthermore, the physician opined that admission to a residential treatment center was "not the most cost-effective treatment that could have been effectively and safely utilized with this patient."[64] Critically, while the InterQual Criteria was included with the materials provided to the reviewing physician, Premera's accompanying instructions were clear that the Criteria "should not be used as the basis for the determination" and "review must be made based on the provisions of the [P]lan."[65]

In response to the S. Family's Level II Appeal, the external reviewer likewise concluded that C.J.S.'s residential treatment care was not medically necessary pursuant to the Plan definition.[66] While the InterQual Criteria was provided to the external reviewer, the reviewer's evaluation and conclusions do not discuss the Criteria but rather apply the Plan definition of medical necessity to evaluate C.J.S.'s clinical information.[67] The external reviewer concluded that the "request is not recommended for approval because he had no objective noted, current

---

[62] Dkt. 57 at 51 (Sealed).

[63] *Id.*

[64] *Id.* at 51–52.

[65] *Id.* at 52.

[66] *See* Dkt. 57-10 at 108–10 (Sealed).

[67] *See Id.*

11

mental problems that would have needed 24 hour care, supervision, observation, management, or containment."[68]

Based on the administrative record before the court, Plaintiffs have failed to show that further review of C.J.S.'s treatment claims, based solely on the Plan's terms and without application of the InterQual Criteria, would yield a different result. Defendants have already ordered such review in response to the S. Family's Level I and Level II Appeals and concluded that C.J.S.'s residential treatment care was not medically necessary as required for coverage under the Plan terms. Furthermore, the external reviewer's decision, in response to the S. Family's Level II Appeal, is "final and [] generally binding upon the [P]lan" pursuant to the Plan's own terms and Washington state law.[69] Plaintiffs have not demonstrated that analysis under the same Plan terms would differ on reconsideration.[70]

At bottom, the S. Family's request for specific performance suffers a failure of proof—the S. Family has not demonstrated that the requested specific performance would rectify a suffered harm. Defendants assert that C.J.S.'s residential treatment care was already determined not medically necessary under the Plan terms, independent of the InterQual Criteria.[71] Where the

---

[68] *Id.* at 110.

[69] Dkt. 59-1, *2017 Summary Plan Description* at 88 ("The external review agency decision is final and is generally binding upon the plan."); Wash. Admin. Code § 284-43A-150 (2017); Wash. Rev. Code § 48.43.535(8) (2022) ("Carriers must timely implement the certified independent review organization's determination . . .").

[70] *See* Dkt. 82 at 29–32; Dkt. 85, *Plaintiffs' Reply in Support of their Motion for Summary Judgment* at 10–12.

[71] In moving for summary judgment, Defendants argued that C.J.S.'s residential mental health treatment was not "medically necessary" because, in addition to their application of the InterQual Criteria, it did not satisfy the Summary Plan Description element of being "cost-effective, as determined by being the least expensive of the alternative [] levels of service that are medically effective and that can be safely provided to the enrollee." Dkt. 58 at 28.

S. Family has not rebutted this showing,[72] they have failed to provide the court with a basis for concluding that there quested equitable remedy would provide relief.

Absent a showing that ordering specific performance would remedy harm suffered by the S. Family, "it would be inequitable to do so."[73] Based on the record before the court, and considering the facts and circumstances of the case, specific performance is not required to put the S. Family in the position they would have attained but for Defendants' Parity Act violation.[74] The S. Family already occupies such a position and further equitable remedy is not warranted to restore the status quo.

### 3. Surcharge, Restitution, or Disgorgement

Plaintiffs' claim for relief in the form of surcharge, restitution, or disgorgement likewise fails. Plaintiffs seek surcharge in the amount of $217,085.90 to recoup their expenditure of $211,757.00 to provide for C.J.S.'s residential treatment care and $5,328.90 to appeal Defendants' denial of coverage.[75] Alternatively, Plaintiffs seek either disgorgement or restitution in the amount of $211,757.00.[76] Defendants respond that, because C.J.S.'s residential treatment care "was not medically necessary under the Plan terms, without regard to the

---

[72] *See* Dkt. 82 at 29–32 (discussing the InterQual Criteria in relation to the medical necessity of C.J.S.'s residential treatment care); Dkt. 85 at 10–12 (arguing that "Plaintiffs have demonstrated that it was medically necessary under the InterQual Criteria for [C.J.S.] to receive care at Daniels Academy."). The S. Family's argument before this court largely focused on the InterQual Criteria and did not meaningfully address whether, but for the application of the InterQual criteria, C.J.S.'s residential treatment would have been covered under the Plan terms.

[73] *Wesley*, 177 U.S. at 376. *See, e.g., Liu v. SEC*, 140 S.Ct. 1936, 1943, 1949–50 (2020) (balancing the equitable principles "that the wrongdoer should not profit by his own wrong" and "that the wrongdoer should not be punished by paying more than a fair compensation to the person wronged" in considering the SEC's power to award equitable relief under 15 USC § 78u(d)(5)).

[74] *See Gabriel*, 773 F.3d at 958.

[75] Dkt. 95 at 9.

[76] *Id.* at 9–10.

InterQual [C]riteria, . . . [t]he [c]ourt should deny Plaintiffs' request for . . . surcharge, disgorgement, or equitable restitution."[77] In the alternative, Defendants assert the court should deny Plaintiffs' request for surcharge, disgorgement, or restitution because these are "common law quasi-contract remedies" preempted by ERISA's requirement that benefits claims be determined by the Plan terms.[78] Because the court agrees that, on the administrative record before it, C.J.S.'s claims are not covered under the Plan terms, it will not address Defendants' preemption argument.

Surcharge is an equitable remedy providing monetary relief for "a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment."[79] Disgorgement "wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs."[80] And equitable restitution "restore[s] to the plaintiff particular funds or property in the defendant's possession."[81]

Though permitted under different theories, each of these equitable remedies requires a loss, ill-gotten gain, or transfer traceable to Defendants' wrongdoing.[82] Here, because C.J.S.'s residential treatment care was not deemed medically necessary under the Plan's terms, even without application of the InterQual Criteria, Defendants' Parity Act violation did not result in

---

[77] Dkt. 104 at 7.

[78] *Id.* at 11.

[79] *Peters v. Aetna Inc.*, 2 F.4th 199, 216 (4th Cir. 2021); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011) ("[A] fiduciary can be surcharged under §502(a)(3) [i.e. 29 U.S.C. § 1132(a)(3)] only upon a showing of actual harm—proved (under the default rule for civil cases) by a preponderance of the evidence.").

[80] *Peters*, 2 F.4th at 217 (quoting *S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993).

[81] *Great-West Life & Annuity Ins. Co.*, 534 U.S. at 214; *see also Id.* at 213 ("[A] plaintiff could seek restitution in equity. . . where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.").

[82] *See* Dkt. 95 at 9–10.

Plaintiffs' monetary loss or Defendants' ill-gotten gain.[83]  As with Plaintiffs' request for specific performance, Plaintiffs' request for surcharge, disgorgement, or restitution suffers a failure of proof.  Plaintiffs have not tethered the requested equitably relief to harm incurred due to Defendants' Parity Act violation or demonstrated how the relief sought would remedy any such harm.[84]

## CONCLUSION

For the reasons stated, the court finds Plaintiffs are not entitled to any additional remedy for Defendants' Parity Act violation.  The court GRANTS Plaintiffs' Motion for $69,240 in attorneys' fees and $400 in costs.[85]  The clerk of court is directed to close the case.

SO ORDERED this 21st day of June, 2022.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[83] Additionally, equitable restitution would be inappropriate because the $211,757.00 the S. Family seeks repayment of was paid to C.J.S.'s treatment provider, not to Defendants.  Therefore, even if C.J.S.'s treatment should have been covered under the terms of the Plan, that money cannot "clearly be traced to particular funds [] in the [Defendant[s]'] possession." *Great-West Life & Annuity Ins. Co.*, 534 U.S. at 213.

[84] *See, e.g., Gabriel*, 773 F.3d at 957–58 ("'[T]o obtain relief by surcharge' for a breach of the ERISA trustee's duties, 'a plan participant or beneficiary must show that the violation injured him or her,' but 'need only show harm and causation[.]'") (quoting *Amara*, 563 U.S. at 444); *Id.* at 958 ("[T]he participants were not entitled to compensatory relief because they did not suffer any compensable harm.") (citation omitted); *Silva v. Metropolitan Life Ins.*, 762 F.3d 711, 721 (8th Cir. 2014) ("[W]e ask [] whether this wrong has a remedy.  We recognize that some ERISA violations do not always have remedies.").

[85] Dkt. 102.